OPINION
{¶ 1} Plaintiff-appellant, Jordan Norton, appeals from a Jefferson County Common Pleas Court decision granting summary judgment in favor of defendant-appellee, FirstEnergy Corporation.
 {¶ 2} Appellant began his employment with appellee in 1991 as a non-destructive test (NDT) technician. In the later part of 1997, he was assigned to the technical services group under Steve Smith's direct supervision. Smith's supervisor was Brian Warnaka who was based in appellee's Calcutta office.
 {¶ 3} Beginning in 1998, Smith began asking appellant to train the other NDT technicians how to perform an oxide thickness testing technique he had learned from his previous employer, Aptech. According to appellant, he was reluctant to follow Smith's orders because he had signed a non-disclosure form before leaving Aptech. Appellant claimed that he refused to train his co-workers in the testing technique and informed his supervisors that he would not do so based on his non-disclosure agreement. Appellant further claimed that he was told on numerous occasions to disclose the information. Yet he refused.
 {¶ 4} In March of 1999, appellant received his 1998 review, prepared by Warnaka. His performance rating was "does not meet expectations." Two of the major areas of concern in the review were appellant's failure to train his co-workers in oxide thickness testing and his inability to get along with fellow employees. In response to the comment that he did not get along with co-workers, appellant lodged a complaint with his supervisors that he had to endure language that was offensive to him as a Mormon and had to listen to other employees degrade women. Appellant's supervisors subsequently had a meeting with the workers to discuss tolerance and inappropriate language in the workplace.
 {¶ 5} In June 1999, appellant went on sick leave to have surgery for a non-work-related back injury. He was unable to work until November 1999, when his physician, Dr. Jeffrey Tharp, cleared him to work with a one-hour-a-day driving restriction. Appellant lived in Wadsworth. Appellee assigned him to report to the Calcutta office. This drive was more than an hour one way. Appellant nonetheless reported to work in Calcutta for two to three weeks. However, Dr. Tharp submitted another report to appellee stating that appellant's one-hour driving restriction was for the entire day, not just at one time. According to appellee, none of its power plants are located within the driving restriction. Therefore, appellee returned appellant to sick leave until the driving restriction could be lifted.
 {¶ 6} Pursuant to company policy, appellant had to inform appellee of any prescription medications he was taking. During the time in November when he was back at work, appellant submitted notification to appellee that he was taking Percodan, Oxycontin, and Darvocet for pain control. According to appellant's information from his physician, he would have to take pain medications for the rest of his life. Appellant had submitted notifications to his supervisors over the years that he was taking prescribed pain relievers for his pain management, including Percocet and Darvocet. While Warnaka admitted that he received these notices and forwarded them to human resources, the notifications were not in appellant's medical file.
 {¶ 7} After appellant submitted his list of medications in November 1999, appellee's company physician, Dr. Timothy Newman, opined that since appellant was taking narcotics, he should not return to work in a power plant. Dr. Newman expressed concern that it was not safe to allow appellant to return to his position of senior NDT technician while he was taking narcotics. Nothing further was done at this point, however, because appellant was still on sick leave due to his driving restriction.
 {¶ 8} In January 2000, Dr. Tharp cleared appellant to return to work without restrictions. Dr. Newman reviewed Dr. Tharp's opinion and opined that Dr. Tharp may not have been aware of all of appellant's job duties. So Dr. Newman scheduled appellant for an independent medical examination with Dr. Stephen Kaiser. This was in accordance with appellee's policy that employees on sick leave may be referred for independent medical exams at its discretion.
 {¶ 9} According to Dr. Kaiser, appellant was only able to perform light to medium work with a one-hour driving restriction. Dr. Newman agreed with Dr. Kaiser.
 {¶ 10} Because appellee had no light duty work for an NDT technician, appellant did not return to work. In February 2000, appellee transferred appellant to an extended leave status. Appellee informed appellant that if he was unable to return to work after 12 months of continuous absence from the date the disability began (July 8), he could apply for long-term disability benefits and his employment would be terminated. However, if his condition improved, he would have a right to return to work that would expire one year after going on long-term disability.
 {¶ 11} Appellant continued to receive sick leave until July 7, 2000. He then filed an application for long-term disability benefits and was approved. Appellant never returned to work.
 {¶ 12} Appellant filed a complaint against appellee on July 28, 2003, alleging retaliatory discharge and wrongful discharge in violation of public policy. Specifically, he claimed that appellee terminated him in retaliation for reporting the sexual harassment of female employees and complaining about improper language and pornography. Appellant also claimed that appellee terminated him because he refused to disclose his former employer's trade secrets on the method of conducting detailed oxide thickness testing and analysis.
 {¶ 13} Appellee filed a motion for summary judgment on both counts of the complaint. The trial court held a hearing on the motion and subsequently entered summary judgment in favor of appellees on both counts finding no genuine issue of material fact existed. Appellant filed a timely notice of appeal on February 23, 2005.
 {¶ 14} In reviewing an award of summary judgment, appellate courts must apply a de novo standard of review. Cole v. AmericanIndus. Resources Corp. (1998), 128 Ohio App.3d 546, 552,715 N.E.2d 1179. Thus, we shall apply the same test as the trial court in determining whether summary judgment was proper. Civ.R. 56(C) provides that the trial court shall render summary judgment if no genuine issue of material fact exists and when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. State ex rel. Parsonsv. Flemming (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377. A "material fact" depends on the substantive law of the claim being litigated. Hoyt, Inc. v. Gordon Assoc., Inc. (1995),104 Ohio App.3d 598, 603, 662 N.E.2d 1088, citing Anderson v. LibertyLobby, Inc. (1986), 477 U.S. 242, 247-248, 106 S.Ct. 2505,91 L.Ed.2d 202.
 {¶ 15} Appellant raises two assignments of error, the first of which states:
 {¶ 16} "THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY CLAIM WHEN THE RECORD IS REPLETE WITH ISSUES OF MATERIAL FACT AS TO THE REASONS FOR NORTON'S DISCHARGE."
 {¶ 17} Appellant argues that he submitted evidence that demonstrated a genuine issue of material fact as to whether appellee discharged him for his refusal to disclose his former employer's trade secret by training his co-workers in oxide thickness technology.
 {¶ 18} Either party to an employment-at-will agreement may terminate the employment relationship for any reason that is not contrary to law. Mers v. Dispatch Printing Co. (1985),19 Ohio St.3d 100, 483 N.E.2d 150. An exception exists to the employment-at-will doctrine when an employer's discharge of an employee violates a clear public policy. Painter v. Graley
(1994), 70 Ohio St.3d 377, 384, 639 N.E.2d 51.
 {¶ 19} To prevail on a wrongful discharge claim in violation of a public policy, the plaintiff must meet four elements: (1) there must exist a clear public policy that is manifested in a state or federal constitution, statute or administrative regulation, or in the common law (clarity element); (2) dismissal, under the alleged circumstances, must jeopardize the public policy (jeopardy element); (3) plaintiff's dismissal must be motivated by conduct related to the public policy (causation element); and (4) there must be no overriding legitimate business justification for the dismissal (overriding justification).Barnes v. Cadiz, 7th Dist. No. 01-CA-531, 2002-Ohio-1534, at ¶ 14 citing Kulch v. Structural Fibers, Inc. (1997),78 Ohio St.3d 134, 151, 677 N.E.2d 308. The causation and overriding justification elements are questions of fact for the jury, while the clarity and jeopardy elements are questions of law for the court. Id.
 {¶ 20} Appellant's argument focuses on the jeopardy and clarity elements.
 {¶ 21} Appellant bases his public policy claim on Ohio's Uniform Trade Secrets Act, R.C. 1333.61 et seq., and the confidentiality of information statute, R.C. 1333.81. He notes that R.C. 1333.61 et seq. prohibits the misappropriation of trade secrets while R.C. 1333.81 requires that an employee not disclose any confidential information acquired during the course of his employment. These statutes, he asserts, satisfy the clarity element.
 {¶ 22} Appellant next asserts that the ability to interpret oxide thickness results, which he acquired while working at Aptech, constituted a trade secret protected from disclosure despite his supervisors' insistence. He points out that his failure to disclose this information was one of the reasons for his "does not meet expectations" rating. (Smith Dep. 98-99; Warnaka Vol. 2 Dep. 98). And he notes that his refusal was brought up again in a quarterly review prepared by Smith. (Plt. Ex. 8, 13). He argues that his refusal to violate his non-disclosure agreement with Aptech put appellee on notice that he was invoking the public policy protection embodied in the trade secrets and confidentiality statutes. He contends that his poor performance, for failing to be a "team player," was a reason that he was terminated. (Smith Dep. 116).
 {¶ 23} Additionally, appellant argues that appellee had no overriding business justification for requiring him to reveal the trade secret. He notes that after he went on sick leave in 1999, appellee contracted with Aptech to purchase the oxide thickness training. (Smith Dep. 142-43). And appellee agreed not to compete against Aptech using the training. (Smith Dep. 146).
 {¶ 24} These facts, appellant argues, satisfy the jeopardy element. Furthermore, since the causation element and the overriding justification are questions for the jury, appellant asserts that he need not delve into these elements.
 {¶ 25} First, we must determine whether a clear public policy exists in Ohio that prohibits the divulgence of alleged trade secrets and confidential information acquired during employment. It was appellant's burden to establish the specific public policy at issue and to establish how that clear public policy was violated by his termination. Poland Twp. Bd. of Trustees v.Swesey, 7th Dist. No. 02-CA-185, 2003-Ohio-6726.
 {¶ 26} R.C. 1333.62 provides for enjoining actual or threatened misappropriation of trade secrets. Misappropriation includes the disclosure or use of a trade secret of another, without the express or implied consent of the other person, by a person who, at the time of disclosure, knew that the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. R.C. 1333.61(B)(2)(b). Trade secrets include information, processes, procedures, formulas, methods, and techniques that derive independent economic value from not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from its disclosure and is the subject of efforts that are reasonable to maintain its secrecy. R.C. 1333.61(D). R.C. 1333.63
provides for the awarding of damages for misappropriation. R.C.1333.65 provides for the court to preserve the secrecy of trade secrets.
 {¶ 27} Given these provisions, we can conclude that a clear public policy exists that prohibits the divulgence of trade secrets. The legislature clearly set out its intent in R.C.1333.61 et seq. that people should not disclose trade secrets. If one does so, he or she may be enjoined from using the secret information and sued for misappropriation. Furthermore, the court is to exercise diligence to keep trade secrets undisclosed. Thus, appellant met the clarity element.
 {¶ 28} The next element is jeopardy. Appellant argues that his dismissal puts the public policy of prohibiting the divulgence of trade secrets in jeopardy. Without a public policy claim, appellant contends that he and other similarly situated employees would be without a remedy when forced by employers to disclose trade secrets.
 {¶ 29} If appellant's claim was correct, that is, if appellee fired appellant because he refused to train his co-workers in oxide thickness testing and oxide thickness testing was indeed a trade secret, it would seem that he has met the jeopardy element. However, we need not reach that issue. The evidence submitted by both parties was that appellee terminated appellant's employment based on his medical condition and narcotic use, not on his alleged failure to disclose the oxide thickness testing procedure. This leads us to the causation element and overriding justification for appellant's termination. The following testimony is relevant.
 Trade Secret {¶ 30} Appellant stated that Smith asked him to train others in oxide thickness testing. (Norton II Dep. 48-49). Appellant stated that he refused to do so because the information was proprietary and he had signed an agreement with Aptech not to disclose the information. (Norton II Dep. 53). Appellant stated that he could not find a copy of the agreement he signed with Aptech. (Norton II Dep. 53). He stated that the terms of the agreement provided that he could use the techniques he learned while working at Aptech but that he could not transfer the knowledge of those techniques to other companies. (Norton II Dep. 53). Appellant stated that he signed the agreement with Aptech in August 1989 and that it was to last indefinitely. (Norton II Dep. 54). However, he also stated that Aptech purged their documents after ten years. (Norton II Dep. 54).
 {¶ 31} Appellant further stated that when he told Warnaka and Smith that he could not train his co-workers as requested, they told him he was not a team player. (Norton II Dep. 56-58). However, appellant never showed them a copy of his agreement with Aptech; he just told them about the agreement. (Norton II Dep. 56-58).
 {¶ 32} After appellant received a "does not meet expectations" review, Warnaka and Smith prepared a performance improvement plan for him. It included leading others in oxide thickness testing technology and training the younger technicians. (Warnaka Dep. 70-71; Pt. Ex. 2). To Warnaka's recollection, appellant never expressed any reluctance about disclosing any skills he had acquired in his prior employment. (Warnaka Dep. 72). Warnaka testified that appellant was asked on several occasions to train younger technicians in oxide thickness testing but he did not follow through. (Warnaka Dep. 98). Again Warnaka stated that he could not recall appellant ever raising a concern about revealing proprietary information. (Warnaka Dep. 99).
 {¶ 33} Smith also stated that appellant never told him about an agreement with Aptech. (Smith Dep. 145). Smith did note, however, that appellee eventually entered into a contract with Aptech to provide training in oxide thickness testing. (Smith Dep.145). He stated that the contract did not have any type of licensing agreement but appellee did have to consent not to use the information its employees learned from Aptech to compete against Aptech. (Smith Dep. 146).
 {¶ 34} Richard Widdows, one of appellant's co-workers, stated that appellant did in fact train him in oxide thickness testing. (Widdows Dep. 16-18). He stated that appellee then brought Aptech in to conduct training. (Widdows Dep. 16-18). After the Aptech training, appellant then helped Widdows, along with two other technicians, to fine tune their skills. (Widdows Dep. 18-19).
 Narcotic Use {¶ 35} Appellee had a policy that required employees to notify their supervisors of any medications they were taking. (Warnaka Dep. 33; Smith Dep. 167). According to Warnaka, when he received this information he turned it over to the human resources department. (Warnaka Dep. 33).
 {¶ 36} Prior to his back surgery, appellant took pain medications, which he disclosed to Warnaka. On March 6, 1998 and again on November 23, 1998, appellant informed Warnaka that he was taking Darvocet and Percodan for pain control. (Pt. Exs. 30, 37).
 {¶ 37} On November 30, 1999, appellant informed Warnaka and Smith that he was taking Oxycontin in addition to Percodan and Darvocet for pain control. (Warnaka Dep. 113; Smith Dep. 169; Pt. Ex. 14). At this time, appellant was attempting to return to work after his surgery. Warnaka talked with Jacque Ziarko and Dr. Newman from the Wellness Center regarding appellant's return to work. The Wellness Center was appellee's internal medical consultant, which dealt with employees who were on sick leave for extended times. (Smith Dep. 170). Dr. Newman and Ziarko both expressed concern to Warnaka and Smith about appellant working in a power plant while taking the above mentioned medications. (Warnaka Dep. 114-16; Smith Dep. 170).
 {¶ 38} Appellant stated that in early 2000, he was still taking Oxycontin, Percodan, and Darvocet. (Norton I dep. 17-18, 162).
 {¶ 39} Renee Spino, appellee's director of human resources, stated that prior to appellant's back surgery in 1999, Warnaka never contacted her about appellant's medications. (Spino I Dep. 47-49; Spino II Dep. 19). Nor did he ask her to contact the Wellness Center to discuss appellant's medications. (Spino II Dep. 19). Spino stated that generally the supervisor retained information about employees' medications. (Spino I Dep. 48). She did not state that the information was routinely turned over to human resources.
 Medical Condition/Restrictions {¶ 40} Regarding his return to work in November 1999, following his back surgery, appellant stated that he was under restrictions from his doctor. (Norton I Dep. 134). The restrictions included not exceeding one hour of driving per day and doing "light duty." (Norton I Dep. 134). Thus, he could not drive farther than a half-an-hour from his house. (Norton I Dep. 140). Appellee did not have any plants within a half-an-hour from appellant's house in Wadsworth. (Norton I Dep. 140-41). Thus, in early December 1999, Warnaka told appellant not to return to work until his driving restriction was lifted. (Norton I Dep. 142).
 {¶ 41} Dr. Tharp released appellant to return to work on January 25, 2000. (Norton I Dep. 149, Ex. 3). However, appellee would not allow appellant to return to work until he was examined by an independent physician, Dr. Kaiser. (Norton I Dep. 151). Dr. Kaiser examined appellant and opined that he could not perform his normal job duties, which required climbing, heights, balance, and driving several hours a day. (Norton I Dep. Ex. 4). Dr. Kaiser further opined that appellant should do only light to medium work and should not drive more than one hour per day. (Norton I Dep. Ex. 4).
 {¶ 42} On February 15, 2000, Spino sent appellant a letter informing him of his remaining sick time and vacation time. (Norton I Dep. Ex. 5). She also informed appellant that if he was unable to return to work after 12 months of continuous absence from the date his disability began, he could apply for long-term disability benefits. Spino informed appellant he would become eligible for long-term disability on July 8, 2000. (Norton I Dep. Ex. 5). Additionally, she informed appellant that he would have re-employment rights for the first 12 months that he received long-term disability benefits. (Norton I Dep. Ex. 5). This meant that appellee could reinstate him if, in the opinion of a company physician, he had sufficiently recovered to either perform the essential functions of his job or perform the essential functions of an existing job that he could fill, either with or without a reasonable accommodation. (Norton I Dep. Ex. 5). Appellant read and understood this letter. (Norton I Dep. 155-57).
 {¶ 43} Appellant admitted that he applied for and received long-term disability benefits from Unum, his disability insurance provider. (Norton I Dep. 157-59; Ex. 6). In order to receive benefits from Unum, appellant's pain management physician Dr. James Bressi had to complete a form. On this form, there was a space that asked, "What is your treatment plan and/or return to work plan?" (Norton I Dep. Ex. 8). Dr. Bressi wrote, "Totally disabled." (Norton I Dep. Ex. 8). Dr. Bressi further noted, under a section labeled "Limitations (What the patient cannot do)," that appellant had problems standing, sitting, walking, and bending. (Norton I Dep. Ex. 8). Dr. Bressi further indicated that appellant's prognosis for recovery was "poor" and that he did not foresee any fundamental changes in appellant's condition in the future. (Norton I Dep. Ex. 8). Dr. Bressi filled out this form on August 23, 2000. (Norton I Dep. Ex. 8).
 {¶ 44} Dr. Newman stated that appellant first came to his attention in the summer of 1999 when he was referred to the medical case management program by either his supervisor or director. (Newman Dep. 10-11). The reason for the referral was appellant's absence from work due to his back condition. (Newman Dep. 11). Dr. Newman became aware of appellant's pain medications through his history given to Ziarko. (Newman Dep. 22). Dr. Newman learned that appellant was taking Oxycontin, Percodan, and Darvocet. (Newman Dep. 23). He stated that he was primarily concerned with appellant's use of Oxycontin and Percodan because they are level two narcotics, which means they have a high potential for abuse and physical and mental impairment. (Newman Dep. 24).
 {¶ 45} Dr. Newman discussed his concerns with Warnaka. He stated that he had an obligation to notify Warnaka, as management, that appellant's medications could interfere with his job. (Newman Dep. 25). He opined that appellant should not perform "safety-sensitive" work such as working around energized wires, doing electrical work, working at heights, and driving. (Newman Dep. 26). Dr. Newman further stated that at some point, he told Warnaka or Smith that appellant should not be allowed to work if he remained on these medications. (Newman Dep. 31-32).
 {¶ 46} When asked if his opinion would have changed had he known that appellant had taken Percodan and Darvocet for one to two years previously and successfully performed his job, Dr. Newman's answer was negative. (Newman Dep. 32). He stated that he could not recognize past history as a testament to the fact that appellant should take these medications while working for appellee. (Newman Dep. 32). Dr. Newman further stated that once the fact that appellant was taking these medications was brought to his attention, he could not medically recommend the use of the medications and continuing to work. (Newman Dep. 32).
 {¶ 47} Furthermore, Dr. Newman opined that not only was he concerned with appellant's use of narcotics while on the job, he was also concerned with whether appellant could perform the job as a result of his physical condition. (Newman Dep. 35).
 {¶ 48} Based on his concerns, Dr. Newman recommended that appellant have a return-to-work evaluation. (Newman Dep. 37-38). He stated that Dr. Tharp's release did not convince him that appellant had fully recovered from surgery. (Newman Dep. 37-38). After Dr. Kaiser performed appellant's return-to-work evaluation, Dr. Newman stated that he believed Dr. Kaiser performed a thorough assessment of appellant and agreed with Dr. Kaiser's recommendations. (Newman Dep. 42).
 {¶ 49} In an April 1999 meeting with Spino, Warnaka expressed his opinion that he was not looking to terminate appellant because appellant's skills were very valuable. (Spino I Dep. 55; Pt. Ex. 63). In a January 2000 meeting with Spino, however, Warnaka told Spino that he was considering terminating appellant. (Spino I Dep. 86-87). Spino and the manager for employment services advised Warnaka that they did not think terminating appellant was the right approach. (Spino I Dep. 87). Spino stated that as a result, appellant was not terminated at that time. (Spino I Dep. 87-88).
 {¶ 50} When discussing how appellant came to end his employment with appellee, Smith described the events as follows. Concerns were raised about appellant's use of narcotics. (Smith Dep. 223). The Wellness Center was concerned about having someone working in a power plant and driving while under the influence of such a high dose of narcotics. (Smith Dep. 223-24). According to Smith, appellant continued on long-term disability until it ran out. (Smith Dep. 226-27). At that time, his employment was terminated. (Smith Dep. 227). Smith never made a determination that appellant would have been fired at the end of 1999 had he not been on disability. (Smith Dep. 225-26).
 {¶ 51} Furthermore, after he went on disability, appellant never sought to get his job back. (Norton I Dep. 156, 168). Under appellee's disability policy, appellant had one year from the time he went on disability to seek reemployment if his condition improved. (Norton I Dep. Ex. 5). However, appellant never contacted appellee to determine if he could return to work and never submitted any other medical evidence or doctors' opinions to support his return to work.
 {¶ 52} Given this evidence, appellee ended appellant's employment based on his medical condition and use of narcotics, not on his refusal to disclose alleged trade secrets or confidential information. While appellant submitted some evidence that appellee requested him to divulge alleged trade secrets and that he refused to do so, appellant presented no evidence that linked his alleged refusal to train co-workers in oxide thickness testing to the termination of his employment.
 {¶ 53} Dr. Kaiser opined that appellant could not drive more than one hour and had to limit his work activities. Appellant's own doctor, Dr. Bressi, stated on his disability form that appellant's prognosis was poor, that he was totally disabled, and that he had problems standing, walking, sitting, and bending. Dr. Newman had major concerns with appellant returning to work in a power plant while taking schedule two narcotics, which were highly addictive and could impair his abilities. And appellant stated that he would have to take the narcotics for the rest of his life. Additionally, appellant never even sought reemployment or submitted any further medical evidence after he went on long-term disability.
 {¶ 54} Based on the foregoing, appellant failed to raise a genuine issue of material fact regarding the termination of his employment, even construing the evidence most strongly in his favor. Thus, the trial court did not err in granting appellee's motion for summary judgment on appellant's public policy claim. Accordingly, appellant's first assignment of error is without merit.
 {¶ 55} Appellant's second assignment of error states:
 {¶ 56} "THE TRIAL COURT ERRED IN DISMISSING NORTON'S RETALIATION CLAIM WHEN THE EVIDENCE ESTABLISHES A RETALIATORY MOTIVE ON THE PART OF MANAGEMENT."
 {¶ 57} Here appellant argues that he presented evidence to create a genuine issue of material fact on whether appellee terminated him in retaliation for complaints that he lodged. He notes that during a March 12, 1999 meeting with Smith and Warnaka, he complained to them about his co-workers invoking the Lord's name in vain, which was offensive to him as a Mormon, and about their poor treatment of women. (Norton I Dep. 248, 253-58). Appellant notes that while Smith agreed to discuss the issue with appellant's co-workers, Smith warned him that doing so would make the matter more difficult for him. (Norton I Dep. 258, 268, 271, 290). He also notes that he discussed the swearing among technicians with Spino. (Spino I Dep. 16). Appellant also points to Spino's testimony that Warnaka wanted appellant out even though she did not feel there were sufficient grounds to terminate him. (Spino I Dep. 87).
 {¶ 58} Appellant further points out that Dr. Bressi informed Dr. Newman that appellant was capable of performing his job duties while taking Oxycontin and Darvocet. (Bressi Dep. 20-22). Thus, he argues that appellee used his medication as a pretext to force him onto long term disability and ultimately to fire him.
 {¶ 59} R.C. 4112.02(I) provides that it is an unlawful, discriminatory practice to retaliate against an employee who has opposed any unlawful discriminatory practice or has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under R.C. 4112.01 through4112.07.
 {¶ 60} "To prove a claim of retaliation, a plaintiff must establish three elements: (1) that [he or] she engaged in protected activity, (2) that [he or] she was subjected to an adverse employment action, and (3) that a causal link exists between a protected activity and the adverse action. Once a plaintiff successfully establishes a prima facie case, it is the defendant's burden to articulate a legitimate reason for its action. If the defendant meets its burden, the burden shifts back to the plaintiff to show that the articulated reason was a pretext." Peterson v. Buckeye Steel Casings (1999),133 Ohio App.3d 715, 727, 729 N.E.2d 813.
 {¶ 61} As to the first element, appellant presented evidence that he engaged in a protected activity. He lodged a complaint with his supervisors regarding his co-workers' language and treatment of women. His supervisors acknowledged appellant's complaint and took action on it.
 {¶ 62} Whether or not appellant was subjected to an adverse employment action is questionable. There seems to be an issue as to whether appellant was terminated or his employment simply ended. Appellant contends that he was terminated. However, as shown above, it appears appellant went on long-term disability and had the right to return to work within a year if his condition improved. There is no evidence that appellant ever attempted to return to work after going on disability.
 {¶ 63} Assuming that appellant was fired for purposes of this discussion, we must determine whether a causal link exists between appellant's complaints about his co-workers and his ultimate termination. Much time was spent discussing appellant's 1998 performance review.
 {¶ 64} Appellant received a "does not meet expectations" on his 1998 performance review. (Norton I Dep. 184; Pt. Ex. 2). The review, which was prepared by Warnaka and Smith, stated that friction existed between appellant and the other NDT technicians and that appellant did not have a high degree of teamwork with the others. It further stated that appellant needed to take a leadership role with the younger technicians. It also stated that appellant showed up late, provided data without recommendations, and did not adequately communicate with the plant staff. Finally, it stated that appellant had been encouraged to be a leader to the other technicians, but he had not followed through with this role.
 {¶ 65} When asked about not getting along with his co-workers, appellant blamed it on their drinking and bad language, with which he did not agree. (Norton I Dep. 246). Appellant stated that prior to 1999, he had never complained to a supervisor about his co-workers' language. (Norton I Dep. 253-54). However, in 1999, appellant complained to Smith and Warnaka about his co-workers use of vulgarity including the word "goddamn," which offended him as a Mormon, and about the way they treated women. (Norton I Dep. 254-58). Once he lodged this complaint, appellant claimed that Smith told him that he would have to do something about it and that the others would make it worse for him. (Norton I Dep. 258). Appellant also stated that he complained to Spino about his co-workers' language. (Norton I Dep. 260). Additionally, appellant complained to Smith and Warnaka about a co-worker who showed him pornography. (Norton I Dep. 267). And he complained about the way other men treated women in the workplace. (Norton I Dep. 275-76). Appellant raised all of these complaints with Smith and Warnaka at the meeting to discuss his 1998 review. (Norton I Dep. 267, 275-76).
 {¶ 66} Warnaka and Smith also testified about appellant's relationship with his co-workers. Warnaka stated that appellant was frequently late to group meetings and oftentimes did not like to do some of the more basic work. (Warnaka Dep. 64). Smith noted that appellant's lack of teamwork caused friction between him and his co-workers. (Smith Dep. 32). He also corroborated Warnaka's opinion that appellant made it clear that certain jobs were beneath his skill level. (Smith Dep. 33). Smith also noted that during appellant's performance review, he voiced a concern about his co-workers' swearing. (Smith Dep. 57).
 {¶ 67} The problem, from appellant's standpoint, is that no evidence indicates that appellee terminated his employment because he voiced complaints about his co-workers' language and behavior. As appellee notes, appellant raised his complaints in early 1999. He then worked until that summer when he went on sick leave. Appellant subsequently returned to work for a few weeks in November before going on sick leave again due to his driving restriction. He filed for long-term disability in February. Given the time span between his complaints and his ultimate dismissal, the two events were not related. Furthermore, even if appellant was able to establish a prima facie case of retaliation, appellee provided a legitimate reason for its action. As discussed in detail above, the evidence indicated that appellee based appellant's dismissal on his narcotic use and medical condition. In addition, appellant never attempted to return from his long term disability. Thus, the trial court did not err in granting appellee summary judgment on appellant's retaliation claim.
 {¶ 68} Accordingly, appellant's second assignment of error is without merit.
 {¶ 69} For the reasons stated above, the trial court's judgment is hereby affirmed.
Vukovich, J., concurs
Waite, J., concurs