[Cite as *Bahar v. Youngstown*, 2011-Ohio-1000.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| ARLENE BAHAR | ) | CASE NO. 09 MA 55 |
| | ) | |
| PLAINTIFF-APPELLANT | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| CITY OF YOUNGSTOWN | ) | |
| | ) | |
| DEFENDANT-APPELLEE | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from the Court of Common
Pleas of Mahoning County, Ohio
Case No. 07 CV 1341

JUDGMENT:     Affirmed.

APPEARANCES:

For Plaintiff-Appellant:     Atty. Gregory A. Gordillo
Atty. Michael J. Gordillo
Gordillo & Gordillo, LLC
1370 Ontario Street, Suite 2000
Cleveland, Ohio  44113

For Defendant-Appellee:     Atty. Neil D. Schor
Atty. Matthew G. Vansuch
Harrington, Hoppe & Mitchell, LTD
26 Market Street, Suite 1200
P.O. Box 6077
Youngstown, Ohio  44501-6077

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated:  February 25, 2011

WAITE, P.J.

{1}     Appellant, Arlene Bahar, appeals the decision of the Mahoning County Common Pleas Court entering summary judgment against her and in favor of Appellee, the City of Youngstown, on her retaliation claim. Bahar was the Clerk of the Youngstown City Council from November of 1997 to February of 2006. She contends that genuine issues of material fact exist as to whether she was terminated in retaliation for reporting allegations of sexual harassment against councilman, Artis Gillam, Sr., to other members of city council and the city law director. Because Appellant cannot establish a causal connection between her protected activity and her termination, Appellant's sole assignment of error is overruled and the judgment entry of the trial court is affirmed.

{2}     An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court as set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Before summary judgment can be granted, the trial court must determine that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 364 N.E.2d 267. When a court considers a

motion for summary judgment, the facts must be taken in the light most favorable to the nonmoving party. Id.

{3} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis sic.) *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 296, 662 N.E.2d 264. If the moving party carries its burden, the nonmoving party has the reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. Id. at 293, 662 N.E.2d 264. In other words, in the face of a properly supported motion for summary judgment, the nonmoving party must produce some evidence that suggests that a reasonable factfinder could rule in that party's favor. *Brewer v. Cleveland Bd. of Edn.* (1997), 122 Ohio App.3d 378, 386, 701 N.E.2d 1023.

## ASSIGNMENT OF ERROR

{4} "The trial court below erred in granting the Defendant-Appellee, City of Youngstown's Motion for Summary Judgment on Count Two of Plaintiff-Appellant Arlene Bahar's Amended Complaint."

{5} R.C. 4112.02(I) provides that it is an unlawful, discriminatory practice to retaliate against an employee who has opposed any unlawful discriminatory practice or has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under R.C. 4112.01 through 4112 .07. "To prove a claim of retaliation, a plaintiff must establish three elements: (1) that [he or]

she engaged in protected activity, (2) that [he or] she was subjected to an adverse employment action, and (3) that a causal link exists between a protected activity and the adverse action." *Norton v. FirstEnergy Corp.,* 7th Dist. 05-JE-5, 2006-Ohio-892, ¶60.

**{6}** "Once a plaintiff successfully establishes a prima facie case, it is the defendant's burden to articulate a legitimate reason for its action. If the defendant meets its burden, the burden shifts back to the plaintiff to show that the articulated reason was a pretext." Id. citing *Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 727, 729 N.E.2d 813.

**{7}** Close temporal proximity between the employer's knowledge of the protected activity and the adverse employment action alone may be significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (noting that some cases have "accept[ed] mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality" but that they have only done so when the temporal proximity is "very close"); *Payton v. Receivables Outsourcing, Inc.*, 163 Ohio App.3d 722, 2005-Ohio-4987 (two day interval); *Thatcher v. Goodwill Industries of Akron* (1997), 117 Ohio App.3d 525, 535, 690 N.E.2d 1320 (three week interval).

**{8}** On the other hand, where some time elapses between the employer's discovery of a protected activity and the subsequent adverse employment action, the

employee must produce other evidence of retaliatory conduct to establish causality. See *Hall v. Banc One Management Corp.*, 10th Dist. No. 04AP-905, 2006-Ohio-913, ¶47 (noting in a case alleging retaliation that "an interval of two months between complaint and adverse action 'so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link'"), reversed on other grounds by 114 Ohio St.3d 484, 2007-Ohio-4640, 873 N.E.2d 290; *Ningard v. Shin Etsu Silicones*, 9th Dist. No. 24524, 2009-Ohio-3171, ¶17 (holding that mere temporal proximity does not suffice, "especially where the events are separated by more than a few days or weeks"); *Boggs v. Scotts Co.,*10th Dist. No. 04AP-425, 2005-Ohio-1264, ¶26 (additional evidence required after two month interval); *Aycox v. Columbus Bd. of Ed.*, 10th Dist. No. 03AP-1285, 2005-Ohio-69, ¶21 (additional evidence required after two to four month interval); *Briner v. Nat'l City Bank* (Feb. 17, 1994), 8th Dist. No. 64610 (additional evidence required after three month interval).

{9} Here, Appellant attempts to first rely upon the close temporal proximity of her protected activity and her termination to establish the causal connection necessary to raise a prima facie case. In the event that her temporal proximity argument fails, she contends that inaction on the part of city council following her allegations of sexual harassment is additional evidence that she was fired in retaliation for her protected activity.

{10} The procedural history of this case is unusual. A few days after Appellant was terminated, Gillam filed a lawsuit against her for defamation and

intentional infliction of emotional distress. Appellant responded by filing counterclaims against Gillam for sexual harassment and retaliation. Appellant then filed a separate lawsuit against the City of Youngstown alleging sexual harassment and retaliation. As a result, Appellant was deposed on two separate occasions: by Gillam's counsel on February 28, 2008 ("Bahar Depo.") and by counsel for the City on November 19, 2008 ("Bahar Depo. II"). After the cases were consolidated, the original lawsuit between Gillam and Appellant was settled. The trial court ruled against Appellant in both her sexual harassment and retaliation claims. Appellant did not appeal the dismissal of her harassment suit and is before us solely on the issue of retaliation.

{11} The following facts are taken from the Appellant's depositions unless otherwise noted. Appellant was a salaried "at will" employee, as that term is defined by Ohio law. She was supervised by all of the seven members of city council and its president. (Bahar Depo., pp. 15, 17.) Appellant described the clerk position as having flexible hours, because she was often required to work evenings, weekends, and early mornings. (Bahar Depo. II, p. 74.) She claimed that her work load determined her hours, and that she averaged forty hours a week. (Bahar Depo., pp. 18, 23.)

{12} According to Gillam, Appellant was terminated because of work performance, more specifically, "[Appellant's] repeated failure to arrive at work on time and to be available at times to assist Council members to perform their Council functions." (Gillam Aff., ¶8.) During her employment with city council, Appellant

never had a performance evaluation, and there was no policy handbook governing her conduct. (Bahar Depo. II, pp. 65, 84.) Gillam was not deposed for the purpose of summary judgment.

{13} At her first deposition, Appellant claimed that Gillam required more attention than the other members of council, and that she often went to his home or office to help him correct problems with his cell phone and personal digital assistant. (Bahar Depo., p. 101.) Appellant's first and, the record reflects, only reported allegation of sexual harassment occurred on November 23, 2001 when she went to Gillam's residence to deliver legislative materials.

{14} Appellant documented the alleged incident in a memorandum, dated December 31, 2001, that she forwarded to two members of city council, James Fortune [who was replaced on council by the time of her termination] and Richard W. Atkinson. According to the memo, Gillam asked Appellant to deliver legislative materials to his home on November 23, 2001, and during a discussion in his living room, he asked her if she was "as attracted to him as he was to [her]." (12/31/01 Interoffice Memorandum, p. 1, attached to Bahar Depo. II.) When Appellant expressed surprise, Gillam said that he did not want to put her on "the hot seat." Appellant told Gillam that it was "too late" and that she did not think of him that way. (12/31/01 Interoffice Memorandum, p. 1.)

{15} In addition to the memorandum, Appellant said she spoke with Atkinson directly about the alleged incident, and also recounted the incident to a third city councilman, Rufus Hudson. Appellant insisted both in the memos to Fortune and

Atkinson and verbally to Hudson that the information she was disclosing should remain confidential. (Bahar Depo. II, pp. 35, 43.) She further stated in the memos that she did not wish to pursue any action against Gillam at that time, but that she was making a record of the incident "should future reference be necessary or should any repercussions occur." (12/31/01 Interoffice Memorandum, p. 1.) The record does not reflect that Gillam knew of either the memorandum or her discussions with these councilmen.

{16} Appellant testified that Atkinson, Fortune, and Hudson told her to behave professionally toward Gillam, because she served at the pleasure of council, but that she should try to limit her exposure to Gillam. They also offered to deliver Gillam's legislative packets to his home in order to avoid any uncomfortable situations for Appellant. (Bahar Depo. pp. 97-98.) Appellant conceded that the November, 2001 incident was the first and only allegation of sexual harassment that she ever reported.

{17} Appellant claims, however, that she endured several other unreported inappropriate exchanges with Gillam after November 23, 2001 but prior to February 15, 2006, which she characterized as both sexual harassment as well as retaliation for rebuffing Gillam's alleged advances in 2001. She recounted five incidents in her depositions: (1) Gillam telling her she has pretty eyes (Bahar Depo., p. 82); (2) Gillam admiring her legs (Bahar Depo., p. 68); (3) Gillam admiring her breasts (Bahar Depo., pp. 81-82); (4) Gillam asking if she wore a particular skirt for him (Bahar

Depo., p. 68); and (5) Gillam telling her that men in his family have large penises (Bahar Depo., p. 81.)

{18} Appellant concedes that she never confronted Gillam about his comments, nor did she ask him to stop making such comments. (Bahar Depo., p. 83, Bahar Depo. II, p. 32.) She also concedes that she never reported any of the above alleged incidents of harassment/retaliation to any other members of city council.

{19} She claimed that the comment regarding her skirt occurred in the summer of 2003, and remarks about her breasts were made in the summer of 2005. (Bahar Depo., pp. 68, 82.) The remaining comments were made "throughout the period from November of 2001 through 2006." (Bahar Depo., p. 64.) Appellant stated that she maintained calendars during her employment with city council that contained more specific information regarding Gillam's harassment, however those calendars were not offered as part of the summary judgment process and are not in the record. (Bahar Depo., p. 69.)

{20} The trial court concluded that the foregoing allegations, even taken as true for the purpose of the summary judgment motion, did not fulfill the "severe and pervasive" element necessary to establish a prima facie case in sexual harassment. (2/18/09 J.E., p. 2.) Appellant is not appealing the trial court's judgment as to her sexual harassment claim and, hence, this decision is final.

{21} As earlier stated, the only issue on appeal is the trial court's decision regarding her retaliation claim. Appellant contends that, over the course of the more than four years that passed between the 2001 memo and discussions and her

termination, she repeatedly informed members of council that Gillam was hostile toward her and treating her unfairly. However, Appellant concedes that she never told any of the council members that she believed that she was being sexually harassed by Gillam, or that she believed that the harassment was retaliation for her rejection of his sexual advances in 2001. (Bahar Depo., pp. 98-105) Further, at the time of her firing, one of the three council members to whom she reported the 2001 incident, Fortune, was no longer serving as a member of council.

{22} At her second deposition, Appellant was asked, "[i]n your intent to keep [the first incident of sexual harassment] confidential, was the incident discussed as being the grounds for the retaliation with the other Councilmen, excluding Atkinson and Hudson?" Appellant responded, "[n]o." (Bahar Depo. II, pp. 64-65.)

{23} When pressed to articulate evidence of Gillam's hostile treatment, Appellant stated, "Gillam seemed to have more than the normal preoccupation with -- and by more than normal I'm saying more than the other members of city council -- with regard to where I was, who I was meeting with." (Bahar Depo., p. 100.) She further stated that Gillam "seemed to take issue with [her] work" shortly after she sent the December 31 memo to Fortune and Atkinson. (Bahar Depo. II, p. 58.) Again, the record does not reflect that Gillam knew of this memo.

{24} Despite these statements, Appellant claimed later in her second deposition that no member of council had ever discussed any problems with her work hours, prior to a staff meeting called by Gillam on February 8, 2006. (Bahar Depo. II,

p. 73.) She also claimed that she never feared termination based upon her work performance prior to the staff meeting. (Bahar Depo. II, p. 78.)

{25} The February 8, 2006 staff meeting was attended by Council President Charles Sammarone, and four council members, Paul Pancoe, Mark Memmer, Hudson and Gillam, as well as Appellant and staff members, Terri Dawson and Claire Maluso. (Bahar Depo. II, pp. 69-70.) Appellant claims that problems with her work hours were discussed for the first time at this meeting.

{26} According to Gillam's affidavit, "council members voiced their concerns about [Appellant's] performance." (Gillam Aff., ¶8.) According to affidavits provided by Appellant and Hudson, Gillam was the only council member at the staff meeting to question Appellant's work performance. (Bahar Aff., ¶4-5, Hudson Aff., ¶3.) In Hudson's affidavit, he characterized Appellant's work performance as "above and beyond the call of her duties." (Hudson Aff., ¶4.)

{27} Appellant stated that when she pressed Gillam for specific examples of problems created by her unavailability during work hours, he provided only broad generalizations criticizing her attendance. (Bahar Depo. II, p. 71.) At the end of the meeting, Appellant approached Gillam and told him that she "felt powerless and feared the possibility of termination." (Bahar Depo. II, p. 75.)

{28} Appellant stated that prior to the staff meeting, in January, 2006, she spoke to City Law Director, Iris Guglucello, in order to determine her rights as an employee. She told Guglucello that she had been subjected to a hostile work environment "as a result of [sic] inappropriate sexual advance from dollar [sic] of [her]

superiors." (Bahar Depo., p. 87.) She did not identify Gillam as the source of these advances.

{29} She spoke with Guglucello again on February 13, 2006, five days after the staff meeting. As a result of their conversation, Guglucello issued a memorandum to Appellant that same day, captioned "PRIVILEGED ATTORNEY-CLIENT DOCUMENT," informing Appellant that, as an employee of city council, the sexual harassment policy in effect for city employees was not applicable to her. Guglucello suggested that Appellant file a complaint with the Ohio Civil Rights Commission or the Equal Employment Opportunities Commission. (2/13/06 Guglucello Memo, p. 1.)

{30} At some point prior to her termination, she submitted a claim to the equal employment commission in Cleveland, Ohio. (Bahar Depo. II, pp. 89-90.) She says that the commission informed her that it had no jurisdiction to investigate a political body. (Bahar Depo. II, p. 90.) She did not pursue any other claims with any other agencies.

{31} On February 14, 2006, Appellant was called to a meeting at the city law department. Three councilmen, Gillam, Memmer, and Pancoe, attended the meeting. At the meeting, Gillam warned Appellant that she would be terminated at the February 15, 2006 council meeting, and he requested her resignation to avoid embarrassment. (2/15/06 Bahar Memo., p. 2.) Although Appellant says she refused to resign at the meeting, she was apparently silent about her harassment and retaliation claims.

**{32}** Later that day, she approached Hudson, Atkinson, Sammarone, and city councilwoman Carol Rimedio-Righetti to inform them about the meeting at the law department. (Bahar Depo. II, p. 95.) It was at that time that Appellant says she told Atkinson and Hudson she believed that her termination was retaliatory based on her December of 2001 memo. (Bahar Depo. II, p. 98.)

**{33}** On February 15, 2008, the day of her firing, Appellant prepared a letter directed to the members of city council stating that she had "endured emotional distressed [sic] caused by [Gillam] that [she] believe[s] stem from a prior incident in which [she] failed to return a sexual advance." (2/15/06 Bahar Memo., p. 1.) She recounted the events of the staff meeting, including her conversation with Gillam where she stated that she feared for her job. In her letter, Appellant concluded that "the recent and prior acts of [Gillam] have accumulated and escalated over the years and he has demonstrated that he will stop at nothing short of getting rid of me. I feel that I have no choice but to proceed with filing a formal complaint with the appropriate authorities unless City Council as a whole can addresses [sic] this issue." (2/15/06 Bahar Memo., p. 2.)

**{34}** However, according to her first deposition, Appellant hand delivered Atkinson's letter and mailed the remaining letters on February 16, 2006, after she was fired. (Bahar Depo., p. 40.) According to her second deposition, Appellant mailed this letter to members of council on February 15, 2006, the day she was terminated, with the exception of Atkinson's letter, which was hand delivered that day. (Bahar Depo. II, p. 26.)

{35} At the council meeting of February 15, 2006, following an executive session, council voted to terminate Appellant's employment in a four-to-three vote. Councilmen Gillam, Pancoe, Memmer and Rapovy voted to terminate Appellant's employment, while Councilmen Atkinson and Hudson and Councilwoman Carol Rimedio-Righetti voted to retain Appellant. Appellant did not mention her accusations of harassment or retaliation on Gillam's part at the city council meeting.

{36} According to the affidavits of Hudson and Atkinson, both men asked for an explanation for Appellant's termination during the executive session, as well as at the council meeting, but no explanation was provided. (Hudson Aff., ¶7-8, Atkinson Aff., ¶5-6.) According to Hudson, during the executive session, when Gillam was asked why Appellant was being terminated, he responded, "I don't have to explain anything, I have the votes." (Hudson Aff., ¶7.)

{37} Based on the foregoing facts, Appellant argues that she was fired for reporting what she characterizes as Gillam's continuing sexual harassment from November of 2001 to February 15, 2006. On February 18, 2009, the trial court entered summary judgment in favor of the city on both counts of Appellant's first amended complaint. Before the trial court on summary judgment were both of Appellant's depositions, the affidavits of Councilmen Gillam, Hudson, and Atkinson, Appellant's response to the city's first set of interrogatories and request for production of documents, Guglucello's memorandum to Appellant dated February 13, 2006, Appellant's February 15, 2006 memorandum to members of city council, and a transcript of a staff meeting conducted on February 8, 2006, transcribed by Appellant.

The transcript is accompanied by an affidavit of Appellant, attesting to the fact that she recorded the staff meeting as a matter of course, and transcribed it in an effort to refresh her recollection of the events that occurred.

{38} In granting summary judgment to the city on the retaliation claim, the trial court reasoned that "[Appellant] complained about Gillam's alleged sexual harassment after learning that she might be terminated for performance related issues. In addition, [Appellant] had told only two council members about the alleged sexual harassment prior to 2006." (2/18/09 J.E., p. 3.)

{39} In her first argument in this appeal, Appellant contends that summary judgment was inappropriate because of the close temporal proximity between her protected activity and her termination. In order to demonstrate the close temporal proximity of those events, she claims that she engaged in protected activity at least three times in the days before her termination: on February 13, 2006, during her conversation with Guglucello; on February 8, 2006 during her conversation following the staff meeting with Gillam; and on February 15, 2006, during her conversation with Atkinson and Hudson. In addition, Appellant's counsel asserted at oral argument (without foundation) that Appellant told every member of city council that Gillam was retaliating against her because of her 2001 allegations of sexual harassment. Because the foregoing communications either do not constitute protected activity or do not establish that council was aware of the protected activity, Appellant's temporal proximity argument must fail.

**{40}** With respect to her communications with Guglucello, Appellant claims that "[t]he Law Director indisputably had knowledge of [Appellant's] protected activity during the ten days immediately before [her] discharge. As legal counsel to the City Council, [the law director] would have been derelict in her duties had she not informed the council members of [Appellant's] complaints that had been made so close in time to the legislative act of firing her." (Appellant's Brf., p. 16.) However, this statement is, at best, supposition. Appellant has absolutely no evidence of record with which to support this statement. Additionally, the inference that Appellant draws, that Guglucello informed the members of city council about Appellant's complaint, is directly contradicted by Guglucello's February 13, 2006 memo on its face. The memo is captioned, "PRIVILEGED ATTORNEY-CLIENT DOCUMENT." Therefore, the evidence as reflected in this record shows that Guglucello considered her conversations with Appellant to be privileged, and did not repeat Appellant's statements to the members of city council. Although Appellant's deposition testimony in this regard tends to establish that she attempted to engage in protected activity, it does not establish that any member of council knew of her protected activity.

**{41}** Next, Appellant relies on her conversation with Gillam after the staff meeting to establish close temporal proximity between her protected activity and her termination. However, her deposition testimony does not establish that she confronted Gillam about the alleged retaliation at or after the staff meeting. In her second deposition, counsel for the city asked Appellant if she raised the issue of Gillam's alleged sexual harassment and retaliatory conduct during the staff meeting:

**{42}** "Q Did the issue of your fear of powerlessness, fear of termination – I'm sorry – feeling powerless, fear of termination, concerns about what you believed to be retaliatory conduct by [Gillam], did that come up as an agenda item or a discussion at that meeting?

**{43}** "A No.

**{44}** "* * *

**{45}** "Q Okay. And since you're familiar with the record of the meeting, was your, as this is going on and you're hearing about, as you talk about in your letter, specific work issues concerning you, did you at any point in time in that meeting raise the issue or discuss [Gillam's] what you believe to be retaliatory behavior or any fears you had about it?"

**{46}** "* * *

**{47}** "A To the first part of the question, being familiar with the record of the meeting, I can't say that I am familiar with the record of the meeting.

**{48}** "* * *

**{49}** "A There weren't specific instances [of my job performance] that were discussed in the meeting.

**{50}** "* * *

**{51}** "A There weren't specific instances that were discussed in the meeting. * * * They were general. They weren't specific. So I'm just trying to follow the question.

**{52}** "Q Okay, and my question is this: As you're hearing this and thinking, he's acting this way against me, I may lose my job, I don't know what's happening, you know, I'm feeling perplexed; as you're sitting there, did you raise the issue of his behavior on the record or in front of everybody there?

**{53}** "* * *

**{54}** "A Again, during this meeting I was trying to ascertain what specifically he had a problem with.

**{55}** "Q Okay. All right.

**{56}** "A And that did not occur. What I did feel and what I was communicating to [Gillam] is that he was taking issue with my performance as a result of my complaint against him for sexually harassing me.

**{57}** "Q: Okay. But you can't identify what specifically -- do you have any idea what he may have been referring to as far as work performance?

**{58}** "A: No." (Bahar Depo. II, pp. 80-83.)

**{59}** In her briefs, Appellant relies on the quote, "what I was communicating to [Gillam] is that that he was taking issue with my performance as a result of my complaint against him for sexually harassing me," to demonstrate that she had engaged in protected activity, and that Gillam was aware she was engaging in protected activity because "[Appellant] testified about a conversation she had with [Gillam] a week before he vote to fire her." (Appellant's Reply Brf., p. 5; see also Appellant's Brf., p. 9.) To the contrary, the quote, in its context, reveals that Appellant apparently believed that by pressing Gillam for specific examples of her

poor work performance at the staff meeting, which he did not or could not provide, she was forcing him to acknowledge to himself that his complaints about her work performance were unfounded and motivated by anger and resentment. The quote clearly speaks to what Appellant believed she was communicating during the staff meeting, not that she actually verbalized her beliefs that Gillam was retaliating against her for her claims that he engaged in sexual harassment. The record reflects that she did not verbalize these claims.

{60} In fact, Appellant conceded a few pages earlier in that same deposition that she never raised the issue of Gillam's sexual harassment and retaliatory behavior at the staff meeting. (Bahar Depo. II, p. 80.) She also conceded at this deposition that she never confronted Gillam about her complaints against him or asked him to stop making sexual comments. (Bahar Depo. II, p. 32.) Accordingly, her claim that she engaged in protected activity during the staff meeting must fail. No evidence of record establishes that she engaged in protected activity, before or during the staff meeting, nor does it establish Gillam's knowledge, or any other member of council, that she was trying to engage in protected activity.

{61} At oral argument, Appellant's counsel cited Appellant's deposition testimony in general in an attempt to argue that she told every member of counsel that Gillam was retaliating against her for reporting the incident of alleged sexual harassment in 2001. This assertion is not supported by the record, however. At her deposition, Appellant was asked whether she told any of the members of council that she believed that Gillam was retaliating against her based upon her sexual

harassment allegations. Appellant responded that she complained about retaliation to the "members of City Council," and clarified that she discussed alleged retaliation of some kind with "[e]ach member of Council * * * including Council President Sammarone." (Bahar Depo. II, p. 59.) She then listed, "Councilman Swierz, John Swierz; Councilman Michael Rapovy; Councilman Ron Sefcik[; and] Councilwoman Carol Righetti, Rimedio-Righetti." (Bahar Depo. II, p. 60.) She stated that she had conversations with Hudson, Atkinson, Sammarone, and Rimedio-Righetti after the February 14, 2006 meeting at the law director's office. She was next asked, "[a]nd you told each of them individually, had conversations that Artis Gillam is retaliating against me because of sexual harassment conduct?" She responded, "[w]hat I was explaining to them, once again, back to what I've said in my prior deposition and also what I've been saying is that, in talking specifically about the incident of sexual harassment, specifically Councilman Atkinson and Councilman Fortune, okay." (Bahar Depo. II, p. 60.)

{62} When Appellant was pressed for specific instances of protected activity that she reported to members of city council, she concedes that, although she complained about Gillam's general treatment of her to the members of council, she did not tell any of them that she believed she was being terminated in retaliation for rejecting his alleged advances in 2001. (Bahar Depo. II, p. 98.) Appellant admitted that she did not accuse Gillam of retaliation for reporting sexual harassment at the meeting at the city law department. (Bahar Depo. II, pp. 93-94.) She also admitted that she approached Hudson, Atkinson, Sammarone, and Rimedio-Righetti after the

law department meeting to ascertain whether they were part of the group of council members intending to vote in favor of her termination, not to report her belief that she was the subject of retaliatory discharge. (Bahar Depo. II, p. 96.)

**{63}** Later in her testimony, she claims that Sammarone and Rimedio-Righetti "were aware that [she] felt that [she] was being retaliated against by Councilman Gillam." (Bahar Depo. II, p. 98.) She then concedes that she did not know whether Sammarone and Rimedio-Righetti were aware that her claim of retaliation was predicated on her 2001 allegations, because she never informed them about the incident. It is clear that she told no one about any other alleged incident. Appellant's deposition testimony established, and the record reflects, that while she complained to several members of council about Gillam's hostile treatment in general, she never attributed his treatment of her to allegations of sexual harassment, in 2001 or any other time. Again, she "specifically" reported this incident, by memo, to only Atkinson and Fortune. (Bahar Depo. II, p. 60.)

**{64}** With respect to Hudson and Atkinson, Appellant states that "[her] discussion with Councilman Atkinson and * * * Hudson, who were privy to the fact that [she] had reported the sexual harassment of Councilman Gillam, [she did] recall saying to them that [she] felt that it was as a result of [her] reporting it that Councilman Gillam was continuing on his path to try to terminate [her]." (Bahar Depo. II, p. 98.) She further states that she spoke "specifically with Councilman Atkinson and Hudson, specifically referring to the prior sexual harassment complaint." (Bahar Depo. II, p. 98.) Therefore, despite Appellant's assertion at oral argument

that she told every member of city council that she was the subject of unlawful retaliation, the record demonstrates that Hudson and Atkinson were the only two remaining council members who were aware of Appellant's 2001 allegations, and they were the only two council members that she approached after the meeting at the law department to accuse Gillam of unlawful retaliation, based solely on her 2001 allegations.

{65} While it is clear that the foregoing evidence, taken in Appellant's favor for the purpose of summary judgment, may establish that she engaged in protected activity, there is no evidence to link such activity to her termination. Appellant offered the affidavits of Hudson and Atkinson in support of her brief in opposition to the summary judgment motion. Neither affiant states that they informed anyone else about Appellant's accusations, or that they shared her allegation at any time with any other councilmen. This record shows that the only instance where Appellant engaged in protected activity occurred in 2001, almost five years before she was fired. Any other "retaliation" Appellant discussed with other members of council was not based on protected activity, but on a general dislike or distaste. Hence, her attempts to base a prima facie case of unlawful retaliation on temporal proximity to protected activity, alone, must fail.

{66} In her second argument in this appeal, Appellant cites *Thatcher v. Goodwill Industries of Akron* (1997), 117 Ohio App.3d 525, 535, 690 N.E.2d 1320, for the proposition that the failure of Atkinson and Hudson to take remedial action

following disclosure of Appellant's 2001 allegation is somehow evidence that her discharge was retaliatory.

{67} The *Thatcher* Court stated:

{68} "The causal relationship between protected activity and termination is established by [the plaintiff's] factual allegations that (1) by virtue of his complaints, his employer knew that he was engaging in a protected activity; (2) his complaints to President Sonnett over the course of 1993 resulted not in any remedial action by Goodwill; on the contrary, Sonnett reacted angrily at one point, threatening physical violence upon Thatcher when the latter brought up the subject at a meeting; (3) Thatcher was terminated just three weeks after Sonnett learned that Thatcher had taken his complaints to the board of trustees, and during these weeks Sonnett and the board discussed the Thatcher affair; and (4) Goodwill reacted more mildly to more egregious actions by other employees than it did to Thatcher's conduct, e.g., by taking no action against McCarty in response to complaints about his allegedly abusive behavior by those allegedly victimized." Id.

{69} The facts presented in this case do not constitute the typical retaliation fact pattern as did the facts in *Thatcher*, and, as a consequence, *Thatcher* is inapplicable in this case. Typically, as in *Thatcher*, a plaintiff reports discrimination or harassment, no remedial action is taken but the allegations are widely known, and the plaintiff is shortly thereafter terminated or otherwise retaliated against. In such a fact pattern, the failure to take remedial action may be evidence of retaliation. Appellant admits that she selectively reported her allegation in 2001 to only Fortune,

Hudson and Atkinson and not to the remaining four members of council or its president. Appellant also expressly told Hudson, Atkinson and then-councilman Fortune that she did not wish to take any action against Gillam. In fact, she asked that the allegations of harassment remain confidential. Appellant cannot be permitted to selectively allege sexual harassment but demand confidentiality, thereby preventing a timely investigation of the allegations, then claim that the acquiescence to her request on the part of those select few is evidence of retaliation on the part of her employers as a group five years later.

{70} This record clearly reflects that, at no point between November of 2001 and February 16, 2006, did Appellant inform Hudson and Atkinson that she had changed her mind and wanted to report the alleged 2001 incident to council as a whole, or that she wanted city council to investigate her claims. Appellant had several opportunities to make her allegations public, but she did not raise her allegations at the staff meeting, at the meeting at the law department, or at the council meeting when she was discharged. In fact, the record reflects that she was completely silent to all members of council, including Hudson and Atkinson, about any further alleged incidents. This record reflects that she reported one incident of alleged harassment to three of her seven co-equal employers, requesting that they take no action, and then dropped the matter for several years. Consequently, Appellant cannot rely upon the lack of remedial action or investigation of her claims alone to establish the causal connection between her protected activity and her adverse employment action.

**{71}** Finally, at oral argument, Appellant asserted a "cat's paw" theory of liability for the first time in this case. The "cat's paw" theory in the employment discrimination context refers to a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse hiring decision, thereby hiding the subordinate's discriminatory intent. *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir.2006); see also *Arendale v. City of Memphis*, 519 F.3d 587, 604 fn. 13 (6th Cir.2008) ("When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability.")

**{72}** Appellant argues that Gillam influenced the other city council members to terminate her based on work performance, thereby hiding his retaliatory intent. Even assuming that Appellant had established that Gillam was aware of her protected activity, and the record does not appear to support such an assumption, Appellant has not offered any evidence to show that Gillam in any way influenced the votes of the remaining members of council. Unlike a typical "cat's paw" case, where the unbiased decisionmaker relies upon the biased subordinate's assessment of the plaintiff's job performance for the purposes of terminating his or her employment, there is no evidence that any other members of council relied on Gillam's evaluation of Appellant's work when they voted in favor of her termination. Appellant concedes that she worked for all of the members of city council and that she provided varying

degrees of support and assistance to each of them, as required. Each member, then, was in a position to independently evaluate her work. See *Wilson v. Stroh Cos.*, 952 F.2d 942, 946 (6th Cir.1992) (when a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed). Appellant has offered absolutely no evidence on which we can rely to impute the allegedly retaliatory intent of Gillam to the other members of city council. The trial court held, and we are bound by its final order, that no sexual harassment took place. Appellant has no evidence of record, other than base supposition, to show that Gillam knew she was engaging in protected activity. Hence, Appellant fails to establish the requisite causal connection on which to base her retaliation claim.

{73} In summary, Appellant attempts to argue that there is such a close, temporal proximity to her engagement in protected activity and her termination that this alone should have caused the trial court to find she had established a prima facie case of unlawful retaliation. The record reflects, however, that the only instance of record where Appellant engaged in protected activity to the knowledge of at least some of her employers was in 2001, approximately five years before her firing. Lack of investigation on the part of these select few of several employers is not, by itself, evidence of a causal connection between protected activity and termination because Appellant both selectively reported her allegation and specifically requested both that no action be taken (pending further incidents) and that her report remain confidential to those specific persons. Finally, Appellant fails to establish causal connection for a

prima facie case in her "cat's paw" theory because she has presented no evidence that the allegedly biased decisionmaker directly influenced the other (co-equal) decisionmakers to terminate her. Because Appellant has not established a causal connection between her protected activity and her termination, Appellant's sole assignment of error is overruled, and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Vukovich, J., concurs.