[Cite as *Kruegel v. Salem*, 2026-Ohio-1933.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

JOSHUA KRUEGEL,

Plaintiff-Appellant,

v.

CITY OF SALEM ET AL.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 CO 0035**

---

Civil Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2024 CV 432

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Taurean J. Shattuck*, Spitz, The Employee's Law Firm, for Plaintiff-Appellant and

*Atty. Gregory A. Beck* and *Atty. Andrea K. Ziarko,* Baker Dublikar, for Defendants-Appellees.

Dated: May 26, 2026

**DICKEY, J.**

{¶1} Appellant, Joshua Kruegel, appeals the September 30, 2025 judgment entry of the Columbiana County Court of Common Pleas sustaining the summary judgment motion filed on behalf of Appellees, City of Salem ("City"), J.T. Panezott, the Chief of the Salem Police Department ("SPD"), and Lindsay Fraas, the SPD Supervising Dispatcher, in this employment discrimination action filed pursuant to R.C. Chapter 4112. In his complaint, Appellant alleges he was the subject of discrimination based on his sex (gender) (Count I), a hostile work environment (Count II), and retaliation by the City (Count III), while he was employed as a part-time dispatcher at SPD. Appellant further alleges Chief Panezott and Fraas aided, abetted, and incited the discrimination in violation of R.C. 4112.02(J) (Count IV). Appellant appeals the entry of summary judgment in favor of Appellees on all of his claims with the sole exception of his claim predicated upon a hostile work environment.

{¶2} Appellant advances three assignments of error. In his first and second assignments of error, Appellant contends the trial court erred in determining there were no genuine issues of material fact as to whether the City's proffered reason for his termination was merely a pretext for discrimination and/or retaliation. In his third assignment of error, Appellant contends the trial court erred in determining there were no genuine issues of material fact as to his aiding, abetting, and incitement claim against Chief Panezott and Fraas. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶3} The following facts are taken from Appellant's deposition testimony unless otherwise noted. Appellant was previously employed in a part-time capacity by the City from either late 2013 or early 2014 through 2016. During that time, he was also a part-time flight attendant for Delta Airlines. He left his employment with the City to pursue full-time employment with an airline. According to Chief Panezott, Appellant's 2022 employment was his third term of his employment with the City, all during Chief Panezott's tenure as the chief of police. (Panezott Depo., p. 31).

{¶4} In a text message sent from Appellant to Chief Panezott in November of 2021, Appellant expressed his desire to return to employment with the City. The City's

counsel read a portion of the text into the record at Appellant's deposition, that is, "I'm going to ask you to legitimately consider, and please read all of this, please bring me back to dispatch." (Kruegel Depo., p. 23). Appellant did not remember authoring the text, but ultimately conceded he sent it.

{¶5} Chief Panezott testified Appellant is the son of Chief Panezott's cousin. According to Chief Panezott, Appellant was given another chance in 2022 because "he is family and [Chief Panezott] was hoping [Appellant] grew up." (Panezott Depo., p. 19-20). According to Chief Panezott, it was "[his] decision to give [Appellant] one more chance if [SPD Administrative Lieutenant David Casto] was willing to take [Appellant] back." (*Id.* at p. 19).

{¶6} Lieutenant Casto testified he was responsible for hiring and firing, implementation and enforcement of policies and procedures, and investigating employee complaints. Despite his responsibility for personnel decisions, Lieutenant Casto acknowledged Chief Panezott has the authority to terminate the employment of a dispatcher without Lieutenant Casto's approval. (Casto Depo., p. 24).

{¶7} Lieutenant Casto testified he was responsible for Appellant's re-employment in 2022. Lieutenant Casto further testified he had no reservations regarding Appellant's return because Lieutenant Casto "likes" Appellant. (*Id.* at p. 32).

{¶8} Appellant was offered and accepted a non-bargaining unit part-time dispatcher position, which guaranteed 20 to 35 or 36 hours per week. His employment with the City resumed on November 2, 2022 and he was assigned the midnight to 8 a.m. shift ("midnight shift").

{¶9} According to Chief Panezott, Appellant's probationary period, which is ninety days for dispatchers according to the City's Personnel Manual, was extended to one year as a consequence of a conversation between Chief Panezott and Appellant and a text message that Chief Panezott sent to Appellant, which is not in the record. (Panezott Depo., p. 31). The only evidence in the record relating to Appellant's probationary period is a December 17, 2022 electronic mail from Lieutenant Casto to Melissa Hiner, the City's payroll clerk, which reads in its entirety, "[p]lease move [Appellant] to Probationary status effective December 17, 2022." Appellant was "not sure" whether he was hired on a probationary status.

{¶10} When Chief Panezott recounted the reasons for Appellant's termination at Chief Panezott's deposition, he cited Appellant's status as a probationary employee. However, the City does not predicate its argument in this appeal on Appellant's probationary status.

{¶11} There are three categories of dispatchers at SPD – full-time dispatchers, part-time dispatchers and sub-dispatchers. Full-time and part-time dispatchers are scheduled to work, while sub-dispatchers are called only when a scheduled dispatcher calls off due to illness ("call-outs"). Full-time and part-time dispatchers are scheduled to work eight-hour shifts. According to Fraas, there was a total of seven dispatchers at all times relevant to the complaint: three full time-dispatchers – Fraas, Meranda Stull, and Ally Beeson; two part-time dispatchers – Appellant and Lori Endsley; and two sub-dispatchers – Tim Costo and Lacey Thrasher. (Fraas Depo., p. 21-22).

{¶12} With respect to the chain of command in the dispatch office, Fraas testified she was Appellant's direct supervisor, Lieutenant Casto was her direct supervisor, and Chief Panezott was Lieutenant Casto's supervisor. In Lieutenant Casto's absence, Fraas reported directly to Chief Panezott. (*Id*. at p. 31-32).

{¶13} Endsley began her employment with the City roughly two weeks before Appellant resumed his employment in November of 2022. According to an unsworn statement from Endsley, the schedule was designed for three part-time dispatchers, so because SPD only had two part-time dispatchers there was a vacant eight-hour shift each week that had to be filled. Endsley preferred to work twelve-hour shifts. As a courtesy to Endsley, Appellant conceded he had agreed to consider, on a week-to-week basis, the division of the third vacant eight-hour shift into two four-hour shifts to be added to both Endsley's and Appellant's normal eight-hour shift resulting in a twelve-hour shift for each, with the approval of Fraas and Lieutenant Casto.

{¶14} The facts giving rise to Appellant's gender discrimination and retaliation claims began when Appellant volunteered to work the midnight shift on New Year's Eve of 2022. At some time in late November or early December, Appellant asked Fraas if she could work the midnight shift on New Year's Eve in his stead. According to Appellant, Fraas agreed to work the shift without qualification and she replaced Appellant's name with her own name on the schedule.

Case No. 25 CO 0035

**{¶15}** On December 21 or 22, 2022, Fraas informed Appellant that she could not find a babysitter and Appellant would have to work the midnight shift on New Year's Eve. Appellant denied Fraas had previously conditioned her ability to work on the availability of a babysitter.

**{¶16}** Appellant and Fraas went "back and forth," and at some point Fraas lamented Appellant "was always giving her problems." (Kruegel Depo., p. 28). More pointedly, Fraas "specifically stated that [Appellant] was a negative male presence, and at one time said she preferred an all-female dispatch staff." (*Id.* at p. 27). At her deposition, Fraas denied telling Appellant she was "sick and tired of his negative male energy," however she conceded she probably "said something along the lines of him being negative." (Fraas Depo., p. 36).

**{¶17}** Appellant added Fraas likened his behavior to the behavior of her estranged husband. Specifically, Appellant testified, "I'm the only male in [the dispatch office] and she prefers the female[s] because of the exact kind of stuff [her] ex-husband was [g]oing through as she was going through a divorce at that time and she was adamant and very demeaning of her ex-husband." (Kruegel Depo., p. 60-61). Appellant reasoned Tim Costo was a sub-dispatcher, who did not appear on the schedule, so Appellant considered himself the only male dispatcher.

**{¶18}** Due to Fraas' inability to work the midnight shift on New Year's Eve, Appellant asked Endsley to exchange shifts, as she was scheduled for the 4 p.m. to 12 a.m. shift ("4 p.m. shift") on New Year's Eve. Endsley agreed and Fraas approved the substitution.

**{¶19}** Several days later on December 28, 2022, Fraas sent an electronic mail to Appellant informing him that he would be required to work the midnight shift on New Year's Eve. Fraas explained she had discussed the shift exchange with Lieutenant Casto and they concluded substitution of personnel was prohibited where the original dispatcher had volunteered for the shift. Accordingly, Appellant was reassigned to and ultimately worked the midnight shift on New Year's Eve.

**{¶20}** Lieutenant Casto was acting chief in late December of 2022 and early January of 2023 as Chief Panezott was on vacation leave. Appellant spoke to Lieutenant

Casto on the telephone prior to New Year's Eve regarding Fraas' statements and conduct. Lieutenant Casto responded, "what do you want me to do, Josh?" (*Id.* at p. 61).

**{¶21}** In the middle of January of 2023, Appellant moved from the midnight shift to the 4 p.m. shift. In a February 9, 2023 text message exchange with Fraas, Appellant announced his intent to discontinue his voluntarily division of the vacant shift to facilitate twelve-hour shifts for Endsley. Appellant alleges Fraas converted his voluntary arrangement into an obligation at some point in early 2023 and resulted in a reduction in his hours.

**{¶22}** At some time prior to February 9, 2023, Appellant could not recall the date but estimated "[e]arly to mid January," Fraas changed the order in which call-outs were made. Prior to January of 2023, if a scheduled dispatcher called off, remaining dispatchers were called in the following order – subs, then part-time, then full-time, in *inverse* seniority (according to Appellant). In January of 2023, Fraas began filling shifts vacated by scheduled employees in the same order with respect to classification (subs, then part-time, then full-time), but in order of seniority. Endsley had been hired two months before Appellant, so she was now called prior to Appellant. Appellant testified there was a form in the dispatch office that reflected the original policy (inverse order), but he did not offer it as an exhibit.

**{¶23}** Appellant alleged Fraas changed the call-out procedure to reduce his hours in retaliation for his decision to end his voluntary division of the vacant shift arrangement with Endsley. Specifically, Appellant testified:

> The hours were taken from me because I was originally hired to work a certain shift and then every couple of weeks [Endsley] and I, I would give her those additional hours and that was based on if I wanted to do that and agreed that week between [Endsley] and I and I gave her those additional hours for her. When I said I didn't want to do that anymore, after the conversation in December, and I wanted to do what I was hired to do, I wanted my hours back, then that's when the issue – this issue came about.
>
> . . .

Case No. 25 CO 0035

The call-out procedure and my hours being taken away. I asked to have my hours back that I originally split with [Endsley] on an as-needed basis for her and I was told no and she got, like, to keep those hours.

(*Id*. at p. 46-47).

**{¶24}** Fraas became the dispatch supervisor "sometime in 2022." (Fraas Depo., p. 18). She testified the call-out procedure was based on seniority when she accepted the supervisor position, and the only change to the procedure during her tenure as supervisor was the amount of time that elapses between each telephone call when a message was left for the recipient (from five to ten minutes). (*Id*. at p. 24).

**{¶25}** When Appellant was specifically asked at his deposition "what did [Fraas] retaliate against you for," Appellant responded, "[b]ecause I called her 'Tina.'" (Kruegel Depo.*,* p. 55). Appellant explained Tina Cutright was the previous dispatch supervisor, who prepared the dispatch schedule to benefit herself without regard to any inconvenience caused to other employees. Appellant further alleged Tina would offer to switch shifts, then renege and deny ever agreeing to alter the schedule.

**{¶26}** In a face-to-face conversation with Lieutenant Casto during the second weekend of January of 2023, Appellant recounted the events of December then added he felt "targeted" by Fraas to such a degree that he asked the afternoon sergeant to stand in the dispatch office during Appellant's shift change with Fraas. (*Id.* at p. 62). Appellant got "no response" from Lieutenant Casto. (*Id.*).

**{¶27}** Appellant reported the foregoing events and Fraas' statements to Chief Panezott upon his return at the end of either the first or second week of January. During the face-to-face conversation, Chief Panezott told Appellant that the matter would be taken under advisement. Chief Panezott denied Appellant ever complained about discrimination or retaliation, only about hours.

**{¶28}** On February 27, 2023, Appellant sent an electronic mail to Lieutenant Casto requesting clarification of the call-out procedure. Lieutenant Casto responded that he will consult with Fraas and "tweak the policy." (*Id.* at p. 62-63).

{¶29} In a letter dated March 10, 2023, Appellant informed Cyndi Dickey,[1] the City mayor, and Attorney Brooke Zellers, the City law director, of his intent to report workplace harassment, retaliation, and sex (gender) discrimination to the Department of Labor and the Equal Employment Opportunity Commission ("EEOC"). The letter reads in relevant part, "[s]pecifically, I have been targeted based on a personal vendetta by my direct Supervisor Lindsay Fraas, who has reduced my hours, significantly [sic] and has sent threatening text messages and very disparaging [electronic mails] through the cities [sic] [electronic mail] server." Appellant writes he is reluctant to pursue his claims through "higher government agencies," and he prefers to address his concerns through conciliation.

{¶30} Appellant met with Mayor Dickey and Attorney Zellers on March 20, 2023. Chief Panezott and Joe Cappuzzello, the City safety and service director, were excluded from the meeting at Appellant's request.

{¶31} At the meeting, Appellant produced an audio recording made with Appellant's mobile telephone of a seventeen-minute conversation between Appellant and Beeson. The audio recording is not in the record. Appellant characterized Beeson as "an objective third party," and he represented he was not working when he recorded their conversation. However, at oral argument, Appellant's counsel conceded Appellant was "on duty" when he recorded his conversation with Beeson.

{¶32} According to Appellant, Beeson confirmed his belief that Chief Panezott was talking badly about Appellant and putting him in a bad light. At his deposition, Appellant could not recall whether Beeson knew she was being recorded or whether he informed her that she was being recorded, however at oral argument, Appellant's counsel conceded Beeson was not aware that she was being recorded. There is no dispute that Appellant did not have the authorization of Fraas or Chief Panezott to record his conversation with Beeson.

{¶33} According to Mayor Dickey's affidavit, Appellant reported during the meeting with her and Attorney Zellers that Appellant believed he was being "treated unfairly and discriminated against because [Fraas] did not like him." (Dickey Aff., ¶ 3). Mayor Dickey avers Appellant did not report Fraas' gender-based comments although he

---

[1] No relation to the undersigned Judge.

did allege he was not being given overtime hours because he was male. According to Mayor Dickey, Appellant spent the majority of the meeting expressing his displeasure during the time he previously spent as a member of the SPD Auxiliary.

**{¶34}** As a consequence of Appellant's allegations, Mayor Dickey instructed Chief Panezott to determine whether Appellant received less overtime than Endsley. Mayor Dickey avers her review of the investigation "revealed that Endsley had only received approximately ½ hour more of overtime hours than [Appellant], which was consistent with the fact that she had seniority within the department." (*Id.* at ¶ 4). The results of the investigation are not in the record. Appellant has not offered any evidence of the reductions of his hours, other than his own testimony. The more-than-two-hour-long meeting was adjourned due to a scheduling conflict and resumed a week later, with only Appellant and Attorney Zellers in attendance.

**{¶35}** At some point during the discussion of Appellant's allegations between Chief Panezott and Mayor Dickey, she informed him that Appellant had recorded a conversation with Beeson while at SPD. Chief Panezott testified that dispatchers and officers alike were "upset" when they learned Appellant had surreptitiously recorded a conversation with his coworker. (Panezott Depo., p. 42).

**{¶36}** The City's stated reason for Appellant's termination is his alleged violation of section 424.5.2 of the SPD Manual. Policy 400, captioned "Patrol Function," defines "the functions of the patrol unit to ensure intra-organizational cooperation and information sharing." By virtue of its caption, the policy appears to govern only patrol functions, however three terms, "officers," "uniformed members," and "members," appear in the text. "Members" are defined in the SPD Manual as "[a]ny person employed or appointed by the Salem Police Department, including: Full-[time] and part-time employees . . ." Section 103.4 (Definitions).

**{¶37}** Policy 424, captioned "Portable Audio/Video Recorders," reads in relevant part, "[t]his policy provides guidelines for the use of portable audio/video recording devices by members of this department *while in the performance of their duties*." (Emphasis added).

**{¶38}** Section 424.5.2, captioned "Surreptitious Use of the Portable Recorder," reads in its entirety:

Case No. 25 CO 0035

Ohio law permits an individual to surreptitiously record any conversation in which one party to the conversation has given his/her permission (ORC § 2933.52).

Members may surreptitiously record any conversation during the course of a criminal investigation in which the member reasonably believes that such a recording will be lawful and beneficial to the investigation.

*Members shall not surreptitiously record another department member without a court order unless lawfully authorized by the Chief of Police or the authorized designee.*

(Emphasis added).

**{¶39}** Chief Panezott was asked at his deposition if he believed Appellant had recorded his conversation with Beeson while in the performance of his duties. Chief Panezott explained he was told by Mayor Dickey that the recording was made at the police department, and "[i]f you're in the building, it applies [to SPD]." (Panezott Depo., p. 56-57).

**{¶40}** The City adopted a progressive discipline policy pursuant to Chapter Nine of the City Personnel Manual. Progressive Discipline Offenses are divided into three groups: Group 1, which are "minor in nature and cause minimal disruption"; Group 2, which are "more serious in nature than Group 1 offenses and if left undisciplined may cause a serious and lasting disruption to the operation of the City"; and Group 3, which are "of a very serious or possibly criminal nature and cause critical disruption to the operation of the City."

**{¶41}** Group 2 offenses include "[w]illful disregard of City rules, regulations, policies or procedures." The appropriate disciplinary action for a first Group 2 offense ranges from "[w]ritten documentation and up to a three (3) day suspension without pay." Group 3 offenses include "threatening, intimidating, coercing or interfering with other employees." The appropriate disciplinary action for a first Group 3 offense ranges from a "fifteen (15) day suspension to discharge."

Case No. 25 CO 0035

**{¶42}** There is no dispute that Appellant's alleged violation of section 424.5.2 was his first offense. However, Chief Panezott concluded Appellant's alleged violation of section 424.5.2 constituted a terminable Group 3 offense and Cappuzzello agreed. Chief Panezott fired Appellant on April 5, 2023.

**{¶43}** Lieutenant Casto testified four female dispatchers and one male dispatcher were employed by the City after Appellant's termination, with the following corresponding dates of hire:

| | | |
|---|---|---|
| April 5, 2023 | - | Casie Simpson |
| May 13, 2023 | - | Kimberly Polluck |
| May 15, 2023 | - | Amber Waller |
| November 27, 2023 | - | Elizabeth Robinson |
| June 7, 2024 | - | Andrew Derby |

(Casto Depo., p. 36-39). The male dispatcher was hired more than three months before Appellant instituted this action.

**{¶44}** Appellant filed his complaint on September 20, 2024. Appellees filed their answer on October 23, 2024. After discovery was complete, Appellees filed their motion for summary judgment on July 17, 2025. Appellant filed his opposition brief on August 14, 2025. Appellees filed their reply brief on August 27, 2025. On August 30, 2025, the trial court sustained the motion for summary judgment in its entirety.

**{¶45}** With respect to Appellant's claims against the City, the trial court concluded Appellant had established a prima facie case of gender discrimination and retaliation and the City had articulated a legitimate business reason for Appellant's termination. The trial court further concluded Appellant had failed to establish there exists a genuine issue of material fact as to whether the City's proffered reason for Appellant's termination, Appellant's violation of the SPD policy prohibiting employees from recording one another without authorization, was a pretext for discrimination and retaliation. The trial court predicated its decision on the "honest belief rule," which renders the validity of the proffered reason for an employee's termination to be irrelevant where the employer offers

evidence that it reasonably relied on the particularized facts that were before it at the time the decision was made. With respect to Appellant's hostile work environment claim, the trial court found the alleged harassment was not severe and pervasive (Appellant does not appeal this decision). After entering summary judgment in favor of the City, the trial court found Appellant's derivative claims of aiding, abetting, and incitement against Chief Panezott and Fraas were moot.

**{¶46}** Appellant filed a timely appeal raising three assignments of error which are taken out of order for the purpose of clarity of analysis.

## ANALYSIS

**{¶47}** This appeal is from a trial court judgment resolving a motion for summary judgment. An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). "Whether a fact is 'material' depends on the substantive law of the claim being litigated." *Beckett v. Rosza*, 2021-Ohio-4298, ¶ 21 (7th Dist.).

**{¶48}** "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted). *Dresher v. Burt*, 75 Ohio St.3d 280, 296 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. "In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor." *Doe v. Skaggs*, 2018-Ohio-5402, ¶ 11 (7th Dist.).

Case No. 25 CO 0035

**{¶49}** The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DETERMINING, AS A MATTER OF LAW, THAT NO GENUINE ISSUE OF MATERIAL FACT REMAINED AS TO [APPELLANT'S] GENDER DISCRIMINATION CLAIM UNDER R.C. § 4112.02(A).**

**{¶50}** R.C. 4112.02(A) makes it an unlawful discriminatory practice, "[f]or any employer, because of the . . . sex . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." While Ohio state courts regularly look to federal case law when considering claims of employment discrimination brought under the Ohio Revised Code, they are not bound to apply federal court interpretation of federal statutes to analogous Ohio statutes. *Coryell v. Bank One Tr. Co. N.A.*, 2004-Ohio-723, ¶ 15.

**{¶51}** To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent and may establish such intent through either direct or indirect methods of proof. *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 583 (1996). Where an inference is required to show the causal connection between a discriminatory statement or conduct and the prohibited act of discrimination, the evidence is considered indirect. *Barber v. Chestnut Land Co.*, 2016-Ohio-2926, ¶ 49 (7th Dist.). Ohio courts apply the burden-shifting method articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and adopted by the Ohio Supreme Court in *Barker v. Scovill, Inc.*, 6 Ohio St.3d 146 (1983), as modified by *Kohmescher v. Kroger Co.*, 61 Ohio St.3d 501 (1991) and *Coryell*, to claims of race, sex, and age discrimination

brought pursuant to R.C. 4112.02 in which the plaintiff relies on indirect evidence. *Ksiazek v. Columbiana Cty. Port Auth.*, 2021-Ohio-1267, ¶ 22 (7th Dist.).

**{¶52}** A plaintiff relying on indirect evidence must first establish a prima facie case of discrimination.  Specifically, the plaintiff must point to evidence demonstrating: (1) he was a member of a statutorily-protected class; (2) he was subject to an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a person not belonging to the protected class. *Coryell* at ¶ 9, citing *Kohmescher v. Kroger Co.*, 61 Ohio St.3d 501 (1991), syllabus.  "The burden to establish the prima facie case by indirect evidence is not onerous," and a "smoking gun is not required."  *Barber* at ¶ 54.

**{¶53}** An adverse employment action "is a materially adverse change in the terms and conditions of the plaintiff's employment." *Paranthaman v. State Auto Prop. & Cas. Ins. Co.*, 2014-Ohio-4948, ¶ 34 (10th Dist.).  Whether a particular action constitutes an adverse employment action is determined on a case-by-case basis. *Samadder v. DMF of Ohio*, Inc., 2003-Ohio-5340, ¶ 38 (10th Dist.).

**{¶54}** Adverse employment actions include termination, demotion evidenced by a decrease in salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices unique to a particular situation. *Dautartas v. Abbott Labs.*, 2012-Ohio-1709, ¶ 52 (10th Dist.).  By contrast, "actions that result in mere inconvenience or an alteration of job responsibilities are not disruptive enough to constitute adverse employment actions." *Id.*

**{¶55}** Upon establishing a prima facie case, a rebuttable presumption of unlawful discrimination arises and the burden of *production* alone shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination. *Sciaretta v. Refractory Specialties, Inc.*, 2018-Ohio-1141, ¶ 32 (7th Dist.), citing *McDonnell Douglas*, 411 U.S. at 802.  "The employer's 'production of evidence of nondiscriminatory reasons, whether ultimately persuasive or not, satisfie[s] their burden of production and rebut[s] the presumption of intentional discrimination' at which point the '*McDonnell Douglas* framework then bec[omes] irrelevant, and the trier of fact [i]s required to decide the ultimate question of fact: whether [the employee proved the employer] intentionally discriminated against him because of [the protected status].' " *Sciaretta* at ¶ 33, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 503 (1993).

{¶56} It is at this point the plaintiff has "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (the ultimate burden of persuasion remains with the employee at all times). An employee can show pretext by demonstrating the proffered reasons had no basis in fact, did not actually motivate the employer's action, or were insufficient to motivate the employer's action. *Roghelia v. Hopedale Mining, L.L.C.*, 2014-Ohio-2935, ¶ 41 (7th Dist.). *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive.").

{¶57} This inquiry reviews the evidence presented in support of the prima facie case again, but "the factual inquiry proceeds to a new level of specificity." *Burdine* at 255; *Reeves* at 145 (although the presumption created by the prima facie case disappears once the employer meets its burden of production, the trier of fact may still consider the evidence establishing the prima facie case and inferences which can be drawn therefrom on the issue of pretext). "Summary judgment is improper if the plaintiff provides evidence from which a jury could reasonably reject the employer's explanation for termination." *Croley v. JDM Services, LLC*, 2025-Ohio-4762, ¶ 70 (10th Dist.).

{¶58} The Second District summarized the evidence necessary to establish pretext as follows:

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are 'factually false.' The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. . . . The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the

credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup.

*Hapner v. Tuesday Morning, Inc.,* 2003-Ohio-781, ¶ 18 (2d Dist.), citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994), abrogated on other grounds by *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009), as recognized in *Geiger v. Tower Automotive*, 579 F.3d 614, 621 (6th Cir.2009).

**{¶59}** Appellant advances three arguments to demonstrate the City's proffered reason for his termination was a pretext for discrimination. First, he argues his alleged violation of section 424.5.2 has no basis in fact, first, because he is a not a member of the patrol unit, and second, because he did not record his conversation with Beeson while in the performance of his duties. Next, assuming his conduct did constitute a section 424.5.2 violation, he argues the violation did not actually motivate his discharge because it was properly characterized as a Group 2 offense, punishable at most by a three-day suspension without pay.

**{¶60}** Turning to Appellant's first argument, Appellant asserts his alleged violation of section 424.5.2 has no basis in fact because section 424.5.2 falls within Policy 400, captioned "Patrol Function." Appellant reasons the prohibition against surreptitious recordings in section 424.5.2 applies exclusively to patrol officers. However, section 424.5.2 plainly reads that it applies to "members." "Members" are defined in the SPD Manual as "[a]ny person employed or appointed by the Salem Police Department, including: Full- and part-time employees . . ." Section 103.4 (Definitions). Accordingly, Appellant's argument that section 424.5.2 applies exclusively to patrol officers is not supported by the plain language of the SPD Manual.

**{¶61}** Next, Appellant argues his alleged violation of section 424.5.2 has no basis in fact because he did not record Beeson while in the performance of his duties. The City

appears to concede Appellant was not in the performance of his duties when he recorded Beeson, but counters Chief Panezott honestly believed Appellant committed a violation of section 424.5.2 when he terminated Appellant's employment because Appellant was in the SPD building when the recording was made.

{¶62} Ohio courts, in order to avoid acting as "super personnel departments," have adopted the "honest belief" rule. As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish the reason was pretextual simply because it is ultimately shown to be incorrect. *Everson,* 2025-Ohio-1335, at ¶ 21 (7th Dist.). "An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.' " *Id.*, quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). Moreover, the pre-termination investigation need not be optimal or leave no stone unturned.

{¶63} "The key inquiry is whether the employer made a reasonably informed and considered decision." *Everson* at ¶ 21. The question at the summary judgment stage is " 'whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.' " *Ceglia v. Youngstown State Univ.*, 2015-Ohio-2125, ¶ 27 (10th Dist.), quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012), quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

{¶64} However, the protection afforded by the honest belief rule is not automatic. Where the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce proof to the contrary. "If there is sufficient evidence for a reasonable jury to find the employer did not have an honest belief in its proffered reason that was based on a proper investigation, summary judgment must be denied." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021).

{¶65} Here, the City argues Chief Panezott honestly believed Appellant had committed a violation of section 424.5.2, based on the facts available to Chief Panezott at the time his decision to terminate Appellant's employment was made. There is no dispute that Appellant recorded Beeson without the authorization of his superiors. Although Appellant argues the recording was not made "while in the performance of his

duties," Chief Panezott testified he broadly interpreted the phrase to include any recording made while an SPD member was on duty at the police department.

**{¶66}** In order to rebut Chief Panezott's testimony, Appellant argues Chief Panezott did not conduct a thorough investigation because he terminated Appellant's employment without listening to the recording. However, the alleged violation of section 424.5.2 is committed by the making of the recording, not the content of the recording.

**{¶67}** Therefore, we find the trial court did not err in concluding Chief Panezott honestly believed Appellant violated section 424.5.2. Appellant had the opportunity to rebut the City's evidence, and relied solely on the sufficiency of the investigation by Chief Panezott. However, the honest belief rule does not require an optimal investigation and the content of the recording is irrelevant to the alleged violation. Consequently, we find the trial court did not err in concluding Appellant's termination was the result of a reasonably informed and considered decision by Chief Panezott.

**{¶68}** Next, Appellant contends his violation of section 424.5.2 did not actually motivate his termination. Even assuming arguendo Appellant's conduct constituted a violation of section 424.5.2, he argues it established at most a Group 2 violation, that is, a violation of City policy that is "more serious in nature than Group 1 offenses and if left undisciplined may cause a serious and lasting disruption to the operation of the City."

**{¶69}** Ohio courts are not permitted to second guess personnel decisions in the absence of evidence of discriminatory motive. *Jones v. Ohio State Univ. Wexner Med. Ctr.*, 2026-Ohio-1149, ¶ 38 (10th Dist.). "An employer may make employment decisions 'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Brown v. Renter's Choice, Inc.,* 55 F.Supp.2d 788, 795 (N.D.Ohio 1999), quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984). "Courts are not to judge whether an employer made the best or fairest decision, but to determine whether the decision would not have been made but for discrimination. . . ." *Mittler v. OhioHealth Corp.*, 2013-Ohio-1634, ¶ 52 (10th Dist.).

**{¶70}** Nonetheless, summary judgment is not appropriate every time an employer offers a business judgment rationale in defense of its actions. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 527 (6th Cir. 2008), citing *Hartsel v. Keys,* 87 F.3d 795, 800 (6th

Cir. 1996). A finder of fact is entitled to call into question the genuineness of the employer's business judgment where an employee introduces evidence that the business decision obviously lacks merit. *Ellis v. Jungle Jim's Mkt., Inc.*, 2015-Ohio-4226, ¶ 59 (12th Dist.); *Kundtz v. AT & T Sols., Inc.*, 2007-Ohio-1462, ¶ 32 (10th Dist.) ("business decision was so lacking in merit as to call into question its genuineness").

**{¶71}** To meet his burden under the second type of pretext (where the honest belief rule does not apply), Appellant stipulates to the violation of section 424.5.2 and admits the violation *could* have motivated the termination of his employment, but must demonstrate that sex (gender) discrimination *actually* motivated his discharge. Appellant argues a violation of section 424.5.2 is properly characterized as a "[w]illful disregard of City rules, regulations, policies or procedures," which "if left undisciplined may cause a serious and lasting disruption to the operation of the City," and should have resulted in at most a three-day suspension without pay.

**{¶72}** Appellant's argument that his violation of section 424.5.2 is at most a Group 2 offense ignores Chief Panezott's testimony that Appellant's co-workers were upset when they learned he had recorded his conversation with Beeson. According to the City Personnel Manual, a Group 2 offense *may* cause a serious and lasting disruption to the operation of the City, whereas a Group 3 offense *has* caused critical disruption to the operation of the City. Appellant's conduct did not solely impact Beeson. Given the impact of Appellant's conduct on the other SPD employees, the trial court did not err in finding Chief Panezott's classification of the section 424.5.2 as a Group 3 offense to be so lacking in merit to call into question its genuineness.

**{¶73}** Accordingly, we find that trial court did not err in concluding there exists no genuine issue of material fact regarding Appellant's argument that his violation of section 424.5.2 had no basis in fact based on the honest belief rule. We further find Appellant failed to establish a genuine issue of material fact regarding his argument that his violation of section 424.5.2 did not actually motivate his termination, as Chief Panezott's conclusion that it constituted a Group 3 offense was not obviously lacking in merit. Therefore, we find Appellant's second assignment of error has no merit.

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DETERMINING, AS A MATTER OF LAW, THAT NO GENUINE ISSUE OF MATERIAL FACT REMAINED AS TO [APPELLANT'S] RETALIATION CLAIM UNDER R.C. § 4112.02(I).**

**{¶74}** R.C. 4112.02(I) prohibits discrimination under the following two situations: (1) where an employee has opposed any unlawful discriminatory practice (opposition clause); and (2) where an employee has made a charge, testified, assisted or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code (participation clause). A plaintiff must make an overt stand against suspected illegal discriminatory action in order to engage in protected activity. *Ksiazek v. Columbiana Cty. Port Auth.*, 2021-Ohio-1267, ¶ 64 (7th Dist.). General complaints of unfair treatment do not constitute protected activity, that is, complaints must specifically allege discriminatory employment practices. *Brown v. O'Reilly Automotive Stores, Inc.*, 2015-Ohio-5146, ¶ 36 (8th Dist.).

**{¶75}** A retaliation claim may be established through direct or indirect evidence. In order to establish a prima facie case of retaliation, the claimant must prove that (1) he engaged in a protected activity, (2) the employer was aware that the claimant had engaged in that activity, (3) the employer took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action. *Greer-Burger v. Temesi*, 2007-Ohio-6442, ¶ 13.

**{¶76}** "Demonstrating the third prima facie element in a Title VII retaliation case, an adverse employment action, is less onerous than in the discrimination context in that it 'is not limited to discriminatory actions that affect the terms and conditions of employment.' " *Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 2021-Ohio-4578, ¶ 38 (10th Dist.), quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). For instance, denial of consideration for promotion, exclusion from meetings, and being singled out for discipline are sufficient to demonstrate adverse employment action for a retaliation claim. *Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 728 (10th Dist. 1999). The Sixth Circuit has held that an investigation of alleged research

misconduct by a university professor could constitute an adverse employment action for purposes of a Title VII retaliation claim. *Szeinbach v. Ohio State Univ.*, 493 F.Appx. 690, 695-96 (6th Cir. 2012). Similarly, the Sixth Circuit has found internal investigations, loss of remote parking privileges, a requirement to complete time sheets, and a suspension and transfer could likewise constitute adverse employment actions to demonstrate a prima facie case of retaliation. *Arnold v. Columbus*, 515 F.Appx. 524, 537 (6th Cir. 2013).

{¶77} With respect to the fourth factor, close temporal proximity between the employer's knowledge of the protected activity and the adverse employment action alone may be significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. *Bahar v. Youngstown*, 2011-Ohio-1000, ¶ 7 (7th Dist.), citing *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that some cases have "accept[ed] mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality" but that they have only done so when the temporal proximity is "very close"); *Payton v. Receivables Outsourcing, Inc.*, 2005-Ohio-4987 (8th Dist.) (two-day interval); *Thatcher v. Goodwill Industries of Akron*, 117 Ohio App.3d 525 (9th Dist.1997) (three-week interval).

{¶78} However, we observed in *Bahar*:

[W]here some time elapses between the employer's discovery of a protected activity and the subsequent adverse employment action, the employee must produce other evidence of retaliatory conduct to establish causality. *See Hall v. Banc One Management Corp.*, 2006-Ohio-913, ¶ 47 (10th Dist.) (noting in a case alleging retaliation that "an interval of two months between complaint and adverse action 'so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link' "), reversed on other grounds by 114 Ohio St.3d 484, 2007-Ohio-4640, 873 N.E.2d 290; *Ningard v. Shin Etsu Silicones*, 9th Dist. No. 24524, 2009-Ohio-3171, ¶ 17 (holding that mere temporal proximity does not suffice, "especially where the events are separated by more than a few days or weeks"); *Boggs v. Scotts Co.*, 10th Dist. No. 04AP-425, 2005-

Ohio-1264, ¶ 26 (additional evidence required after two month interval); *Aycox v. Columbus Bd. of Ed.*, 10th Dist. No. 03AP–1285, 2005-Ohio-69, ¶ 21 (additional evidence required after two to four month interval); *Briner v. Nat'l City Bank* (Feb. 17, 1994), 8th Dist. No. 64610 (additional evidence required after three month interval).

*Id.* at ¶ 8. Finally, temporal proximity also does not establish the requisite connection if "the evidence demonstrates intervening performance concerns." *Whitney v. J.M. Smucker Co.*, 2025-Ohio-2141, ¶ 21 (9th Dist.).

**{¶79}** Once a plaintiff successfully establishes a prima facie case, it is the defendant's burden to articulate a legitimate reason for its action. If the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the articulated reason was a pretext.

**{¶80}** Although the City concedes Appellant established his prima facie case of discrimination, it argues Appellant failed to show a causal connection between his protected activity and the termination of his employment. The City contends temporal proximity alone is insufficient without other indicia of retaliatory conduct. Based on the lower standard of proof required to establish adverse employment actions in retaliation claims, and our duty to interpret the controverted facts in favor of Appellant on summary judgment, we find Appellant established his prima facie case.

**{¶81}** Appellant alleged Fraas made her discriminatory comments on December 21 or 22, 2022. He confronted her about her comments, specifically identifying them as discriminatory, then reported the comments to Lieutenant Casto then Chief Panezott in late December of 2022 and mid-January of 2023. In the meantime, he alleges his opportunity for additional hours was taken away by Fraas' amendment to the call-out procedure, and when he no longer volunteered to split the vacant shift with Endsley. Moreover, Appellant announced his intent to file an EEOC complaint in a letter to Mayor Dickey and Attorney Zellers dated March 10, 2023. The meeting to address the issues raised in the letter was conducted on March 20, 2023, then continued to the following week. Appellant was fired on April 5, 2023. Consequently, we find there is both temporal proximity and additional indicia of retaliation in the record, accepting as true Appellant's

allegations for the purpose of the motion for summary judgment, for the purpose of establishing a causal connection on summary judgment.

{¶82} Appellant advances the same arguments to demonstrate pretext with respect to his retaliation claim as he advances with respect to his sex (gender) discrimination claim. Our analysis of his pretext claims relating to his sex (gender) discrimination claim applies with equal force to his retaliation claim. Appellant's effort to show pretext based on the text of section 424.5.2 is not-well taken based on the relaxed standard created by the honest belief rule. Of equal import, Appellant's pretext argument based on Chief Panezott's characterization of Appellant's section 424.5.2 violation is not so lacking in merit as to call into question the genuineness of Chief Panezott's decision.

{¶83} Finally, Appellant attributed Fraas' alleged retaliatory conduct to non-discriminatory motives at his deposition. He ascribed her motive to personal animus based on his decision to discontinue his voluntary shift-sharing arrangement with Endsley, and the fact that he referred to Fraas as "Tina," which implied she was selfish and arranged the schedule to serve her own purposes without regard to the needs of the other dispatchers. While Ohio courts have recognized a mixed-motive theory of discrimination, Appellant does not advance a mixed-motive argument here, and we find the trial court did not err in concluding there is no genuine issue of material fact as to whether Fraas' conduct was motivated by retaliation for Appellant's protected activity.

{¶84} Accordingly, we find the trial court did not err in concluding there exists no genuine issue of material fact regarding Appellant's argument that his violation of section 424.5.2 had no basis in fact based on the honest belief rule. We further find Appellant failed to establish a genuine issue of material fact regarding his argument that his violation of section 424.5.2 did not actually motivate his termination, as Chief Panezott's characterization of the violation as a Group 3 offense was not obviously lacking in merit to call into question its genuineness. Therefore, we find Appellant's first assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DETERMINING, AS A MATTER OF LAW, THAT NO GENUINE ISSUE OF**

**MATERIAL FACT REMAINED AS TO [APPELLANT'S] AIDING AND ABETTING CLAIMS UNDER R.C. § 4112.02(J).**

**{¶85}** R.C. 4112.02(J) states:

> It shall be an unlawful discriminatory practice . . . [f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice.

**{¶86}** In *Blagg v. S.T.O.F.F.E. Fed. Credit Union*, 2024-Ohio-2579 (8th Dist.), the Eighth District provided the following summary of law regarding the statutory terms:

> "Aid" is generally defined as "to assist" and "abet" as "to incite or encourage." *Evans v. Hillman Group, Inc.*, 2021 WL 1140100, *5 (S.D. Ohio Mar. 25, 2021); *Luke v. Cleveland*, 2005 WL 2245187, *8 (N.D. Ohio Aug. 22, 2005), citing *Horstman v. Farris*, 132 Ohio App.3d 514, 527, 725 N.E.2d 698 (2d Dist. 1999). To aid and abet, a person must " 'actively participate in, or otherwise facilitate, another's discriminatory act in violation of R.C. 4112.02.' " *Martcheva v. Dayton Bd. of Edn.*, 2021-Ohio-3524, 179 N.E.3d 687, ¶ 74 (2d Dist.), quoting *Johnson-Newberry v. Cuyahoga Cty.*, 2019-Ohio-3655, 144 N.E.3d 1058, ¶ 21 (8th Dist.); *see also Luke*, 2005 WL 2245187 at *8 (An aider and abetter is one who " 'knowingly does something which he ought not to do . . . which assists or tends in some way to affect the doing of the thing which the law forbids.' "), quoting *State v. Stepp*, 117 Ohio App.3d 561, 568, 690 N.E.2d 1342 (4th Dist. 1997).

*Id.* at ¶ 97.

**{¶87}** Because we find no reversible error in the trial court's entry of summary judgment in favor of the City on Appellant's retaliation and gender discrimination claims, his derivative claims against Chief Panezott and Fraas are moot.

## CONCLUSION

{¶88} Accordingly, we find Appellant's assignments of error are not well-taken. Therefore, the September 30, 2025 decision and judgment entry of the Columbiana Court of Common Pleas sustaining the summary judgment motion filed on behalf of the City, Chief Panezott, and Fraas is affirmed.

Waite, P.J., concurs.

Hanni, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, Appellant's first and second assignments of error have no merit and the third assignment of error is moot. Therefore, it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**